## WRATHALL v. JOHNSON et al.
No. 5086.   Decided January 2, 1935.   (40 P. [2d] 755.)

52

*E. Le Roy Shields* and *P. C. Evans,* both of Salt Lake City, for appellant.

*R. A. McBroom* and *H. A. Smith,* both of Salt Lake City, for respondents.

MOFFAT, Justice.

In substance and effect the plaintiff alleges: (1) Ownership and occupation of a tract of land consisting of approximately 120 acres, located in the southeasterly portion of Grantsville, Tooele county, Utah, described by metes and bounds. (2) Ownership and occupation by the defendants of a tract of land of approximately 80 acres, adjoining that of the plaintiff, described by metes and bounds. (3) That

these adjoining tracts of land overlie part of an artesian well district, the area of which is about 10 square miles. (4) That underlying all of the described premises there is a well-defined artesian basin. (5) That the water of this basin is fed or supplied by percolating water, the source of which is the mountain watershed lying to the southwest of the artesian basin, and is of such nature that when the impervious cap is pierced the water is forced to flow to and above the surface of the ground; that said impervious cap is located at a depth of about 350 feet below the surface, and slopes gradually toward the north. (6) That within the artesian area of 10 square miles (6,400 acres) plaintiff's lands, approximately 120 acres, and defendants' lands, approximately 80 acres, are located. (7) There are other parties, owners of land, similarly situated to plaintiff and defendants. (8) That for more than thirty-five years plaintiff has used the water from two two-inch flowing wells for the purpose of irrigating shrubbery, trees, and vegetation, and for domestic and culinary purposes. (9) That the flow of the wells amounted to 15 gallons per minute. (10) That the supply is necessary to plaintiff's use and is his sole supply. (11) That during 1927 and 1928 defendants drilled two four-inch wells on their land adjoining that of plaintiff. (12) That in 1929 defendants installed upon their wells an electric pump, and by the operation thereof withdrew from the artesian basin 180 gallons of water per minute and that defendants are not entitled to draw more than 25 gallons per minute. (13) That the pumping of the water from the basin by the defendants has wholly deprived plaintiff of the use of the water theretofore used by him. (14) That, if the defendants are permitted to continue the operation of their pumps so attached to said wells, defendants will eventually exhaust the supply from the artesian basin. (15) That by reason of the acts of defendants in depriving plaintiff of the use of his water plaintiff has not been able to keep livestock or fowls upon his premises, and has been compelled to bring water from a distance for domestic and culi-

nary purposes. (16) That plaintiff for more than thirty-five years has used water from his wells, which water has been drawn in part from defendants' premises, and that said use has been adverse, open, and notorious and under claim of right. Upon the foregoing allegations plaintiff prays for injunctive relief against defendants and for damages.

The foregoing condensed statement of the material allegations of the complaint, contains no reference to any of the parts of the complaint stricken by the trial court except the last item relating to adverse use. Though the complaint is somewhat lengthy, occupying eleven pages of the printed abstract, the allegations have been reduced to the abbreviated or simple form of statement for the purpose of eliminating all matters not going directly to the gravamen of the cause, and to aid in grasping the essential allegations made, to determine whether or not the complaint does contain sufficient, and the necessary, allegations to state a cause of action, and whether or not it is vulnerable to the attack made by the general demurrer sustained by the court. If the complaint thus stripped to its direct and positive allegations state a cause of action, other assigned errors become immaterial for our purposes; that is to say, if, after eliminating all matters sought to be stricken by the motion to strike and those stricken by the court, the complaint still contains sufficient and the essential allegations to invoke the jurisdiction of the court and sustain a judgment based thereon, the ruling of the trial court on the general demurrer would constitute error, and, if the complaint thus considered does not contain the necessary allegations, it may be questioned whether the matter stricken would furnish the elements essential to make it do so.

We have considered the allegations of the complaint with care, and have likewise examined the positions of the parties to the cause as revealed by briefs and arguments. We have endeavored to get at the fundamentals as presented.

Parties to an action have the right to adopt their own theories of a case. *Holman* v. *Christensen*, 73 Utah 389, 274 P. 457. A complaint must be tested by its leading or fundamental allegations. The scope and tenor of a complaint most apparent and clearly outlined by such considerations will be adopted rather than a scope, tenor or meaning indicated by a consideration of detached and fragmentary statements. It is sometimes difficult to harmonize the allegations of a complaint with interpretations and arguments of counsel seeking to support a theory; but, where one position is supported by a pleading and another may not be, the court will adopt that construction of the complaint on general demurrer which will sustain rather than the one which will defeat the action.

"In many cases the courts are called upon to, and frequently do, adjudicate and determine the rights of the respective parties before them contrary to the theories of both litigants." *Gledhill et al.* v. *Malouf*, 58 Utah 105, 111, 197 P. 725, 727; *Neilson et al.* v. *San Pete County*, 40 Utah 560, 123 P. 334.

An examination of the third amended complaint, the attacks that have been made upon it, and those that preceded it, and the arguments of counsel for the respective parties, as well as the reported remarks of the trial court, all disclose more or less contending views growing out of attempts to apply, harmonize, and interpret the case of *Horne* v. *Utah Oil Refining Company*, 59 Utah 279, 202 P. 815, 31 A. L. R. 883. Whether it is the belief that the Horne Case, supra, has departed from the doctrine of priority when applied to artesian areas, or that the doctrine of so-called correlative rights is controlling and incompatible with the doctrine of appropriation, or the only doctrine to be applied to such underground rights, or that the application of the measure of proportionate surface area is the only factor to be applied in determining the quantity to be used under situations analogous to the Horne Case, we may only infer from the arguments, interpretations, and applications offered by the parties litigant, and yet may ultimately be required to decide

such questions. We shall have occasion later to examine further into the Horne Case. For the present we shall proceed to an analysis of the allegations of the complaint, as tested by general principles and independently of the Horne Case.

The complaint contains much that is immaterial and ineptly stated. Some allegations were sticken by the trial court that presented matters upon which evidence should be received. They need not here be pointed out.

The parties to this action assert that the determination of their rights is relatively unimportant when compared with the rights affected, depending upon the principles to be applied in the solution of the problem here submitted. It is asserted that the problem is one not only involving, or at least affecting, the interests of several hundred residents in the area overlying the region where the wells of the plaintiff and defendants are located, but the problem is one of such character and moment as to amount to one of general public interest. The arguments and briefs of counsel have sought to present the questions from a point of view and a breadth of discussion based upon an appeal to fundamental principles. The brief of counsel for respondents especially indicates an appreciation of the magnitude and the importance of the problems.

The principles to be applied to the establishment and maintenance of a right to the use of underground waters have many times been before the courts. Differences as to the conceived nature and character of the underground waters, differences in conception of the principles of law to be applied, differences as to the application of the law to changing, varying, new, and different conditions, as more has been learned about the conditions of underground waters, the increasing demand made upon the supply, with the uncertainties as to quantity and permanency of supply, fluctuations, the methods and means of obtaining such supply, the matters of altitude, pressure, contour, surface and subsurface, location, and other factors not now occurring

to us, all contribute to the complexity of the problems. In certain cases limitations are imposed or applied to a particular problem, in others the complexity, and in others apparent hardship may have affected discussions and affected results and decisions; difficulty in ascertaining and uncertainty as to facts are ever present difficulties; difference of theories as to the principles if law to be applied; and difficulties in interpretation and application of statutes force an approach to the discussion with a sense of responsibility, and impose the question as to whether or not the same law that applies to surface waters or streams also should apply to subterranean waters.

The procedure or method whereby a right to the use of water may be acquired, the nature of the supply or source from which the supply is to be drawn, and the interests affected when considered in the order of time the interests and rights vested, are factors that have been considered and may not be ignored; likewise the conception, as to the nature and source of supply, whether or not it may be denominated public water or a private source, a part of the soil in a comparatively absolute or a limited sense, the extension or limitations to be applied to either, and the principles that aid in guiding the courts aright, find room for thought, discussion, and analysis of these problems.

Whether or not counsel may have overstated the importance of the problem, or whether or not we may be able to fully make use of the proper principles and apply them, the court does recognize the magnitude and the importance of the problem, and the responsibility ever present while labor is bestowed upon seeking a solution thereof. Counsel have contributed help.

One of the statements of counsel relating to the problem is:

"The decision of this court in this action will necessarily fix and define and limit the value of all those arid lands of this commonwealth which may be rendered fertile and productive by the use of underground waters, other than those flowing in well defined channels, and especially those which may be irrigated from artesian sources."

Counsel's statement if correct should impress responsibility. An exception to the sweeping effect of the decision counsel had in mind when the quoted statement was made is contained in the phrase, "other than those flowing in well defined channels." This phrase and its implications calls for more extended consideration later in this opinion. For the present, our purpose is only to call attention to it.

It has heretofore been declared by the courts that water is the very life blood of the agricultural and stock-raising industries of the West and that the state is vitally interested in seeing that none of the waters are allowed to run to waste or go without being applied to a beneficial use. *Deseret Live Stock Co.* v. *Hooppiania,* 66 Utah 25, 239 ■ P. 479. Not only is water the life blood of the industries referred to, but it is the life blood of every industry, and without which no city, town, or village could exist. Waste may not therefore be tolerated, and beneficial use must be fostered, safeguarded, and encouraged, and efforts that will protect and safeguard and develop the interests of the commonwealth and her people in the maintenance of sound principles as applied to the appropriation and use of water call for commendation.

This case was presented to the trial court upon plaintiff's final and amended complaint, and defendants' demurrer thereto and motion to strike from the complaint certain of the allegations thereof. The problem therefore presented is one of law applicable to the allegations of the complaint, conceded to be the facts for the purposes of the demurrer. It is, in so far as the mere statement is concerned, a simple matter to say the demurrer was properly sustained or that it should have been overruled, or that the motion to strike should have been denied or the contrary. What gives importance to the solution of the problem presented by this case is the application of legal and equitable principles to the facts, and the soundness of the reasons for making such application, and the why of the rulings on the demurrer and motion—why the rulings should or should not be sustained.

With commendable frankness the issues have been argued, and the parties have indicated that the principles are more important than cases. The case is conceded to be one in equity, but, whether one in equity or one at law, the question to be determined is: Has plaintiff alleged sufficient to constitute a cause of action and thus invoke the jurisdiction of the court?

"There is in this state but one form of civil action for the enforcement or protection of private rights and the redress or prevention of private wrongs" (Section 6442, Comp. Laws Utah 1917, now 104-1-2, R. S. Utah 1933), and law and equity may be administered in the same action (Constitution of Utah, art. 8, § 19).

A complaint must contain a statement of the facts constituting the cause of action in ordinary and concise language. Section 6566, Comp. Laws Utah 1917, now 104-7-2, R. S. 1933; *California Land & Construction Co.* v. *Halloran,* 82 Utah 267, 17 P. (2d) 209.

A question similar to the one raised in the instant case was raised and discussed in the case of *Katz* v. *Walkinshaw,* 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35. In summarizing the allegations of the complaint, the California court in substance said that the action was brought to enjoin defendant from drawing off and diverting water from an artesian belt which is part on or under the premises of the plaintiffs, and to the water of which they have sunk wells, thereby causing the water to rise and flow upon the premises of plaintiffs, and which had been used for twenty years; that the water was necessary for domestic and irrigation purposes, for watering trees, plants, and shrubs; that without the water the plants would perish and plaintiffs would be irreparably injured; that defendant was diverting the water for sale and to be used on lands of others distant from the artesian area. On a rehearing of the case and commenting upon the ruling as to the complaint, Mr. Justice Shaw (141 Cal. 116, 70 P. 663, 74 P. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35) stated:

"It is urged in the first place that the decision goes beyond the case that was before the court; that the pleadings stated a cause of action solely for the diversion of water from an alleged underground stream, and that, therefore, there was no occasion for a discussion of the principles governing the rights to waters of the class usually denominated 'percolating waters.'"

That court declared the proposition to be untenable. The complaint, in substance, states (1) that the plaintiffs had wells upon their respective tracts of land (2) from which water flowed to the surface of the ground; (3) that the water was necessary for domestic use and irrigation on the lands on which they were situate; (4) that the defendants by means of other wells and excavations upon another tract of land in the vicinity prevented any water from flowing through the plaintiffs' wells to their premises; (5) and that this was done by drawing off the water through the wells of the defendant, taking it to a distant tract, and there using it. Says the court:

"If the principle is correct that the defendant cannot thus, and for this purpose, take from the plaintiffs' wells the percolating waters from which they are supplied, then no further allegations were necessary, and the averment that the water constituted part of an underground stream may be regarded as surplusage."

In the Horne Case, supra, an analysis of the substantive allegations of the complaint was made by Mr. Justice Thurman at page 286 of 59 Utah, 202 P. 815, 817, as follows:

"Without needless repetition the complaint in ordinary and concise language shows the following facts: (1) The existence of the artesian district, including the lands of plaintiffs and defendant; (2) the wells of plaintiffs, their size and dimensions, the beneficial uses to which the water has been devoted, the absolute necessity therefor, and the absence of any other available supply; (3) the sinking and operation of defendant's wells, the size and dimensions thereof, the consequent injury to plaintiffs' wells, and the ultimate destruction thereof for practical purposes if defendant is permitted to continue their operation; (4) the fact that defendant threatens to place large pumps upon its wells, and by means thereof will totally deprive plaintiffs of the water to which they are entitled; (5) that because of said wrongs plaintiffs have been compelled to carry water to their homes for

domestic use, and their lawns, orchards, and gardens are being destroyed for want of water; (6) that the defendant's wells have not been driven for the purpose of utilizing the water upon the land in which they were driven, but to be conducted and conveyed away to its oil refinery beyond the boundaries of said artesian district, there to be used for commercial and manufacturing purposes."

The court then further proceeds to say at page 287 of 59 Utah, 202 P. 815, 818:

"Entirely independent of the fact that defendant does not intend to use the water for the purpose of improving the land upon which the wells are sunk, but contemplates conveying the water beyond the boundaries of the artesian district, there to be used for commercial and manufacturing purposes, it does seem to the court that, if equity can afford relief in a case of this nature, plaintiffs' complaint states a cause of action for such relief."

As will be seen from later references to the Glover Case, 62 Utah 174, 218 P. 955, 31 A. L. R. 900, decided after the decision in the Horne Case, it was determined that an owner of a specified quantity of water from an artesian basin has the right to convey the water to which he is entitled beyond the boundaries of the artesian district and there use or dispose of it for beneficial purposes.

A comparison of the summarized allegations of the complaint in the instant case with those of the Walkinshaw Case and the Horne Case, supra, would seem to justify the conclusion that, if a cause of action was stated by the allegations in those cases, then, a cause of action is stated in the instant case. If such be the sound view, has the case of *Horne* v. *Utah Oil Refining Company,* supra, either by interpretation or actually added to the required allegations in a case of this character, in order that a cause of action may be stated, or must something more and different appear in a complaint now than was required before the decision in the Horne Case? If the Horne Case imposed the condition that the water from a flowing well in a flowing well area imposed the condition as a requisite to the enjoyment of that right, or the allegations necessary to support it

that the water must be used or applied within the flowing or artesian well area, the decision in the case of *Glover* v. *Utah Oil Refining Company*, 62 Utah 174, 218 P. 955, 31 A. L. R. 900, removed any such requirement.

The following excerpts from the Glover Case, supra, dispose of the matter. The pages referred to are of volume 62 of the Utah Reports:

"The real grievance complained of in the Horne Case was that, owing to the increased number and capacity of defendant's wells, the supply of water in the district was being rapidly exhausted and the pressure thereby becoming so reduced that the plaintiffs were being deprived of water to which they were entitled. * * * It was further alleged in the complaint in that case that the purpose of defendant was, not to use the water from its wells on the land upon which the wells were located, but to conduct the water beyond the boundaries of said artesian district. * * *" Page 175, 218 P. 955.

Referring to the complaint in the Glover Case:

"In other words, plaintiff's claim, as alleged in her complaint, is based upon the theory that the waters of the artesian district belong to the owners of the land therein who are using the water upon their land for beneficial purposes, and should be allotted to such persons in proportion to the surface area owned by such persons to the exclusion of the other lot owners who are not using the water upon their lands within said district." Page 177, 218 P. 955, 956.

"Has the defendant the right to purchase from the owners of lots in said artesian district their rights to the water owned by them, and conduct the water to its oil refinery beyond the limits of said district, and there use the same?

"As heretofore stated, it was suggested in the opinion in the Horne Case that such appeared to be a just and equitable application of the doctrine of reasonable use so long as the owners of adjoining lots in said district were not injured thereby. We still adhere to that view of the question, and perhaps in the last analysis the real question is: What would constitute an injury to adjoining owners or persons owning water rights within said artesian district?" Page 177, 218 P. 955, 956.

"This court in the Horne Case did not intend, as its language expressly indicates, to hold that the water of correlative owners in an artesian district could in no case be conveyed away for use on other lands; nor did it intend to indorse the view that there is any analogy

between the correlative rights of owners in such cases and the common-law doctrine of riparian rights." Page 179, 218 P. 955, 957.

"We have not been able to find a single case that goes to the extent of holding that a correlative owner of artesian water cannot convey such water to be used on alien lands; except in cases where such use would injuriously affect the rights of an adjoining owner." Page 183, 218 P. 955, 958.

Counsel for appellant in attacking the trial court's theory that the complaint did not state facts sufficient to constitute a cause of action indicates that it is not necessary to go outside of the record to discover the theory of the trial court, and incidentally indicates that the complaint did not allege that the defendants were not beneficially using the water upon their own land, nor did it allege that they contemplated conveying the water beyond the artesian district, and then quotes from the trial court's decision in sustaining defendants' demurrer, as follows:

"Upon the principles laid down in the Horne Case, the Glover Case, and the Coachella Valley Case [(Cal. App.) 266 P. 341], I sustain the defendants' motion to strike and defendants' demurrer."

What importance attaches to a failure to allege whether or not a defendant is beneficially using the water claimed by a plaintiff upon his own land within or is conveying it beyond the area of the artesian basin in which the water originates, in the face of an allegation that a plaintiff is the owner and beneficial user of the water based upon a long-continued and prior appropriation and beneficial use, describing that use, we have not yet discovered. However, having shown that the Glover Case, supra, imposes no limitation on the place of use, "except in cases where such use would injuriously affect the rights of an adjoining owner," and how or why such exception should be imposed if an owner has a right not necessarily inferior, assuming that the adjoining landowner's right has been found to be equal or correlative, no question of priority intervening, or inferior if subsequent, and the quantity has been definitely fixed as it was in the Glover Case, we have likewise up to

the present time not discovered. At any rate the exception would have no application in the instant case, and whether or not such a case may arise in the future does not call for further discussion of that matter at this time.

Having shown that the Glover Case, supra, has imposed no new or additional requirements as to necessary matters to be alleged in a complaint in a case such as the one before us, we shall next examine the case of *Coachella Valley County Water Dist.* v. *Stevens* (Cal. App.) 266 P. 341, 345.

Briefly, and partly summarized and condensed, the facts in the Coachella Valley Case, supra, are: The plaintiff was an incorporated water district including Coachella Valley of Riverside county, Cal. The complaint describes the water district, the lands owned by the defendant, the proposed action of defendant, and the place and purposes of the proposed use of the water, the land of the valley irrigated and that susceptible of irrigation but not irrigated, and alleges the extent, direction, and slope of the water shed and that Whitewater river flows through the valley, the source of supply of the river flow, the character of the surface and sub-surface of the land of the valley, its arid character and necessity of irrigation, and productivity when irrigated.

It is also alleged that the river runs a good surface stream until it reaches defendant's land, when the river encounters an impervious dyke which causes the accumulation of a subterranean reservoir; that at various places along the river water from the underlying porous masses has been withdrawn by means of pumps, and has been used by the owners of lands in the valley; that the amount of water is insufficient to supply water for all the lands of the valley. It is also alleged that for more than twenty years the defendant and his predecessors have been the owners of land in the valley suitable for cultivation; that shortly before the commencement of the action and without the consent of any of the owners of land, riparian proprietor, or appropriator or user of water in the stream below the land of defendant, and against their protest, defendant has begun to construct

and drill upon his own lands over the subterranean reservoir, or saturated area, wells, and intends to pump water therefrom and conduct the same away from the stream and to other lands. There are also allegations as to a proposed change of a point of diversion of water used by defendant, of the water of Whitewater river.

A demurrer, both general and special, was interposed. The trial court sustained the demurrer, and the action was dismissed. The appellate court, in passing upon the matter, among other things, says:

"The complaint shows clearly that it does not state facts sufficient to constitute a cause of action. It contains no allegations or statement of facts showing that the defendant is digging wells where he has no right to sink the same, nor are there any statements of fact that the defendant is not entitled to draw water from the subterranean sources underneath his own property. The mere statement that the defendant is proceeding to sink wells upon his own land, to tap subterranean sources of water thereunder, and also the waters percolating and saturating the soil under his own lands, establishes the fact that the defendant is proceeding to do just what he has a legal right to do. * * *

"Even if the facts alleged in the complaint are sufficient to bring this action within the rule announced in *Katz* v. *Walkinshaw*, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35, the defendant, as the owner of the land lying above the belt or strata which has become saturated with percolating water, is entitled to a reasonable use thereof on his own land, notwithstanding such reasonable use may interfere with water percolating in or to his neighbor's soil. The limitation as to such owner's right is that he shall not make an unreasonable diversion of such waters percolating therein, and, as further said in the case just referred to, *such waters cannot be carried to distant lands for purposes of sale*, etc. In other words, all the owners of land lying above a saturated belt are entitled to make reasonable use of the waters found beneath their own lands. *No facts are stated in the complaint showing that the defendant was not, or is not making reasonable use of all waters extracted and proposed to be extracted by means of wells sunk or being sunk upon premises belonging to himself.*" (Italics added.)

We have quoted at length from the Coachella Valley Case not alone because the trial court apparently relied upon it

as authority for the ruling made, but for two additional reasons: (1) Both parties to this action make divergent and different applications of the statements made in the case; and (2) we desire to again refer to it when we come to a discussion of the Horne Case. For the present, it is sufficient to observe that both the Coachella Valley Case and the *Katz* v. *Falkinshaw* Case, supra, deny the right of an adjoining landowner to sink wells into an underground area saturated with percolating water, and draw water therefrom and transport it to alien lands for sale or use, but do recognize that all owners of land above a saturated belt are entitled to make a reasonable use of the waters found beneath their own lands. No point as to conveying water away and using it upon alien lands is presented in the instant case, and, if it were, in this jurisdiction the Glover Case, supra, is authority directly holding that such may be done. It is stated thus:

"We are not inclined to subscribe to the doctrine that the owner of a water right within an artesian district cannot use it, or dispose of it for use, beyond the boundaries of the district without the right thereto being forfeited to other users within the district."

—which, put in other language, means that a landowner's right to use water beneficially, the quantity having been determined, and the fact that no one else's right is interfered with, the place of use is "nobody's business," except that of the owner of the right.

The last sentence above quoted from the Coachella Valley Case, viz. "No facts are stated in the complaint showing that the defendant was not, or is not making reasonable use of all waters extracted by means of wells sunk or being sunk upon premises belonging to himself," in a complaint charging waste, might be regarded as essential; but no such requirement exists where a complainant properly pleads his own right and alleges against a defendant a wrongful interference therewith or complete deprivation thereof, with accompanying injury.

While the Coachella Valley Case discussed matters pertaining to underground waters, and construed a statute as to the powers vested in water district corporations, the principal ground upon which the demurrer to the complaint was sustained was that the plaintiff District was neither an owner of water nor of land, and therefore had no rights with which the defendant could interfere in sinking wells and drawing water from his own lands whether percolating, artesian, or connected with a riparian right. As stated by the court:

"This action is based entirely upon the assumption that the Coachella County water district has a legal right to become either plaintiff or defendant or intervene in any controversy affecting simply the private rights of the private landowners owning land within the territorial boundaries of the water district, though none of the waters referred to in the complaint belong to the plaintiff."

It does not appear that the Coachella Valley Case, supra, contains anything tending to support the ruling of the trial court. The only points strictly common to both the Glover Case and the Coachella Valley Case are those of the taking of water from an underground source, and conveying it to alien lands, and as to that the Coachella Valley Case followed *Katz* v. *Walkinshaw*, to the effect that it may not be done, while the Glover Case, supra, says it may. There seems to be no reason to depart from the doctrine of the Glover Case as to that matter.

As foreshadowed in the foregoing discussion and as clearly disclosed from arguments and briefs of the parties litigant, the case of *Horne* v. *Utah Oil Refining*, supra, appears to be the doctrinal rock to which counsel for both parties have hope of secure anchorage, or upon which each expects the other to be wrecked. Both parties to this controversy quote largely from the Horne Case and at times do not seem to be seriously at odds as to certain matters therein discussed. Without quoting or attempting to quote either party or attempting to harmonize definitely or indicate or distinguish the steps by which the parties draw the distinctions

sought to be applied, it seems that the differences are those of application rather than differences of principles advocated.

Plaintiff alleges facts in relation to a priority of right. Are the doctrines of appropriation and priority applicable to subterranean waters of the type or class here in litigation? Plaintiff does not argue that question. It is, however, in issue and under a general demurrer attacking the complaint for want of sufficient facts, and here for consideration.

By express waiver or stipulation, parties litigant may foreclose the court from passing upon a given assignment of error, or considering a particular point; but, where the whole complaint is attacked, and the complaint states a cause of action, though counsel may argue the wrong or a different theory, the court will examine the complaint as to any cause of action stated therein. The cases cited by respondent are not applicable to a case of this character. Generally errors assigned but not argued are deemed waived. In *McKellar Real Estate & Investment Co.* v. *Paxton,* 62 Utah 97, 218 P. 128, 130, it was held that,

"The errors, so far as the admission of testimony is concerned, are not discussed in counsel's brief, and are therefore waived."

In *Utah State Building & Loan Ass'n* v. *Perkins,* 53 Utah 474, 173 P. 950, 955, this court said:

"Counsel have not seen fit to discuss the cross-errors in their brief, and therefore * * * the cross-appeal and cross-errors will be considered abandoned."

In the instant case all the errors assigned go either to the sustaining of the demurrer or the motion to strike. Both are argued.

The complaint also alleges matters that may relate to a right to the use of the quantity of water claimed, if the doctrine of acquiring a prescriptive right or that of adverse user may be applied to such subterranean waters. Appellant does not argue this theory, but respondent does, maintaining that it is not applicable.

Matters are alleged relating to so-called correlative rights, sometimes distinguished without much difference and referred to as the "American rule," the "reasonable use rule," the "correlative rights rule," and the modified "English rule," which, if applicable to the subterranean waters here in litigation, may be considered. Both parties argue upon the proposition of correlative rights, or at least a number of the factors involved in the question of applying the rule, among which are pressure, or head, formation, elevation, pumping, areas, etc. Nothing, however, is said about the source of supply. Litigation over water rights seldom if ever arises until supply falls below needs and one or more claimants assert a right superior to another or others, raising the question that the inferior or subsequent right must yield to the superior or prior right.

The basis upon which a right rests is one thing, and the procedure or method by which the right was acquired is another. Land is subject to private and exclusive ownership and subject to be held and enjoyed as long as the laws pertaining to such right are observed. In this jurisdiction all land originally belonged to the pubic, was public domain of the United States. The right of individual ownership and enjoyment of any part thereof could be acquired by complying with the rules of procedure prescribed therefor. The public interest and public character of land may be extinguished by complying with the law relative thereto; such land then loses its public character and passes into private ownership. The private rights thus imposed may only be changed or passed from one to another by complying with a recognized procedure, that is, either by contract or by prescriptive right or adverse use or occupation as by law prescribed. The situation in the field of water rights is much the same. Originally title thereto was in the public, and the public title could be changed to private title and individual ownership and right of use established by following the recognized procedure to bring about such result.

Whoever would establish an exclusive use must do so in some rightful manner known and admitted by the law.

The fundamental question that has ever been before the courts in consideration of underground or subterranean water and the establishing of a right to the use thereof has been and probably always will be intimately connected with the ownership of the land under which such water is located or through which it passes.

An examination of the cases reveals that the struggle imposed upon interpreters of the law to apply the common-law principles relating to real property or to harmonize them with doctrines relating to the appropriation and use of water has met with indifferent success. "Percolating water is a part of the soil" is familiar common-law phraseology. Once take that position, and the controversy is ended. Uncontrovertible facts force the concession that generally percolating water moves. So that this so-called "percolating water" which "is a part of the soil" moves so that an owner of the soil must capture it while it is there, if he wants it, is common knowledge not to be controverted. If there is no movement of this so-called "percolating water," there is no controversy; it is simply there and not a subject of appropriation under any meaning given to the law of appropriation or use of water. However, if there is movement of water through the soil, be it ever so slow, it is usually found by tracing it from the immediate source of supply through the feeders to the ultimate source. The amount of movement, the quantity and whether or not a source of appropriated supply are matters of fact to be established by evidence. If the proof shows that a source of supply, by a recognized procedure, has been seized, appropriated, and applied to a beneficial use, recognized by the law as such, may such source of supply be cut off or materially or appreciably diminished without giving rise to a cause of action? Every legal or equitable principle answers that it may not be done. That the proof may be difficult to make or that the dividing line between movement or no movement,

whether the alleged supply or source has been materially diminished, constitutes no reason for abandoning or repudiating or fearing adherence to the principle. Once the principle of appropriation of water and priority of right is recognized, when properly limited as to quantity, based upon, measured by, and limited to beneficial uses, the protection of the source becomes of paramount importance. Consumptive use of water incident to irrigation, domestic, and culinary uses necessarily involves depletion of the source of supply unless constant replenishment of the source continues to be equal to or greater than the consumptive use. In the former case continual depletion, and ultimate failure of supply of the needs results in ultimate destruction and loss to all concerned. The physical fact related to a water source is one problem; that law protecting an appropriated source, applied to a benefical use, is another.

This question of a source has not been lost sight of in the cases. It is not always possible to harmonize the cases. As related to a source of supply of subterranean waters, reached by perforations through an overlying cap impervious to water, with certain observations by Mr. Justice Shaw of California, the case of *Burr* v. *Maclay Rancho Water Company*, 154 Cal. 428, 98 P. 260, 261, discusses the problem as interpreted by that court. Because of different limitations, and adoption as controlling, of certain principles upon which there may not be unanimity, the case is not an authority in all of its aspects; yet the analysis and presentation of the facts present a situation so analogous that, without adopting them fully, we make reference thereto:

"The plaintiff sued to enjoin the defendant company from pumping water from its wells on land adjoining that of plaintiff, and transporting such water to distant lands, for irrigation and use on such remote lands. * * * The plaintiff has wells on his land, from which he pumps water sufficient for irrigation, and other uses thereon, and the injury he complains of is the lowering of the water underneath the surface, caused by the pumping of the defendant's wells, whereby his wells are drained of water. * * * The main controversy concerns the rights pertaining to block 191, but the plaintiff also claims the

right to pump water from his wells on that block to irrigate the lands of the other two blocks if he should find it convenient to do so. He did for a short time irrigate 15 acres of block 190. The plaintiff claims that, upon the facts found, the court erred in limiting at all his right to take water by means of his pumps, and in adjudging to the defendant the right to take water from the adjoining lot by means of pumps, or otherwise than by the natural artesian flow of the wells, or to a greater extent than 30 inches of constant flow. * * * The question is therefore fairly presented whether or not, after an appropriator of water from a common water-bearing strata has begun to take the water therefrom to distant lands not situated over the strata, for use on such distant lands, the owner of other overlying land, upon which he has never used the water, may invoke the aid of a court of equity to protect him in his right to thereafter use such water on his land, and thus prevent the appropriator from defeating such landowner's right, or acquiring a paramount right, by adverse use, or by lapse of time. * * * The reasonable rule here would be to hold that the defendant's appropriation for distant lands is subject to the reasonable use of water on lands overlying the supply, particularly in the hands of persons who have acquired it because of these natural advantages, and we therefore hold this to be the law of the case with respect to the lands upon which no water has been used by the plaintiff. * * * The established and settled law of riparian rights in running streams, which have become vested rights, may compel a different rule with regard to such waters in some instances, but these rules of law do not, of necessity, control rights in percolating waters. The most that should be allowed in such circumstances is to give a party the aid of the courts to protect his right and prevent the destruction of his source of supply by excessive use or other cause, * * * The watershed supplying the underground strata is of limited area, and in some years but little water is contributed to the subterranean basin, because of the light rainfall. The effect of the defendant's pumping for a period of a little over 18 months was to lower the permanent water level, as it stood when the pumps were idle, as much as 7 feet. By reason thereof the plaintiff is compelled to lift the water 7 feet higher than before the defendant began its present appropriation. Perhaps, in view of the extreme necessity for water, and the great benefit derived therefrom, this additional burden upon the plaintiff may not be unreasonable. But if the judgment permitting this pumping by the defendant is affirmed without modification, it will be final between the parties, and the defendant will have a perpetual right to continue the drain upon the limited supply. * * *

"It is therefore ordered that the judgment of the superior court be

modified by adding thereto, immediately preceding the date line thereof, the following clauses: '(10) Provided, however, that in no event shall the defendant be allowed to take of the waters in the strata pierced by its wells, a quantity greater than is supplied thereto from the average annual rainfall upon the watershed contributing thereto, and from other sources; nor shall it be allowed to take therefrom a quantity that will reduce the water level in plaintiff's wells, during the periods when the plaintiff is herein given the right to pump therefrom, to such an extent that the plaintiff, with pumps operating at the depth of his present pumps, and with equal capacity, will be unable to obtain therefrom enough water to properly irrigate his said block 191 during such period, not exceeding the quantity hereinbefore stated. * * *' "

Under both the common-law doctrine of riparian right or ownership and the doctrine of appropriation, one located nearer to the source was not permitted to cut off or interrupt or diminish or pollute the source. A right once established upon a stream or source of supply vested in the owner of such right an interest in the stream to to the source. *Cole & Thomas* v. *Richards Irr. Co.*, 27 Utah 205, 75 P. 376, 101 Am. St. Rep. 962; *Yates* v. *Newton*, 59 Utah 105, 202 P. 208; *Chandler et al.* v. *Utah Copper Co.*, 43 Utah 479, 135 P. 106. Such vested interest is not an ownership of the corpus of the water in the same sense as the ownership of land, and, until the water is conducted into the canal, reservoir, or other container belonging to the appropriator, the right is that of use and to have it flow to his place of use without interruption. Water from the source to the point where the appropriator or user captures or diverts it into his conveying channels or containers is *publici juris*, and others have the same right to use it as the appropriator so long as they do not interfere with the appropriator's use, by diminishing his quantity or impairing the quality. *Salt Lake City* v. *Salt Lake City Water & Electrical Power Co.*, 24 Utah 249, 67 P. 672, 61 L. R. A. 648.

Based upon a claimed fear of interfering with or preventing economic development, arguments are advanced asking the court to consider these economic factors in this case.

It must not be forgotten that the safest and surest way of promoting, attaining, and maintaining that development so much desired is by a close adherence to, and profound respect for, vested rights and tested and tried fundamental principles. Progress and safety have been made possible only by adhering to the rules, precedents, and standards that experience has taught and the law has recognized will foster and promote the general welfare. Vested rights and tested fundamentals may not be pushed to one side or out of consideration in the name of temporary economic development. Nor must the construction and application of precedent and experience be so rigid and unyielding as to fail to recognize new conditions and changes and matters of development. The law is and ever has been capable of recognizing the lessons of experience.

Time is probably the most constant element in the acquiring of a right. Singly considered, there is a time to which the initiation of every vested right acquired by an individual may be referred. Procedure and limitations lie at the threshold of every legal right and vested privilege and require conformity thereto before one many enter into the possession, enjoyment or use thereof. Thus personal and property rights and privileges are acquired, if at all, either in a sequential order, or simultaneously, and priority and equality become factors for consideration wherever disputed rights are submitted for determination.

Land and water were originally in public ownership. In the process of settlement and development, a given tract of land passes into private ownership. Water in some form is usually intimately associated with the land, either surface or subterranean or both. The law in this jurisdiction as to surface streams is definitely committed to the doctrine of appropriation. May the same be said as to subterranean waters? Is it necessary to divide subterranean waters into classes? Have the statutes of this state cast all waters, to which vested rights have not attached, into one class, viz., unappropriated public water? Whether surface, subter-

ranean, percolating, or otherwise, all are traceable ultimately to a source. The question of source may not be disregarded. All unappropriated public water is and has been subject to grant by the sovereign power or open to use or subject to appropriation by the citizen in conformity to law. Public waters originate in natural sources. When a different source is made to appear, different problems are involved. A source originating in the irrigation of private lands or by other artificial means within individual control producing what is commonly denominated surface seepage water may be the subject of litigation, but such rights of user are not traceable to a natural source and may be subject to some prescriptive right or adverse use, but are not subject to appropriation in the sense of establishing a priority or prescriptive right of such character as to compel an irrigator or other user of water to irrigate the land to maintain the source of supply. *Garns* v. *Rollins,* 41 Utah 260, 125 P. 867, Ann. Cas. 1915C, 1159; *Roberts* v. *Gribble,* 43 Utah 411, 134 P. 1014; *Stookey* v. *Green,* 53 Utah 311, 178 P. 586.

Water is either a part of the land or it is not, and whether it is or is not is a question of fact. Land is fixed stationary material, remaining in place and movable only by artificial means (except, of course by mechanical, eruptive, seismic, or cataclysmic forces). Soil remains in place and is subject to ownership in place.

"Water is a movable, wandering thing, and no man, State or Nation can receive or give an absolute title to it while it is still flowing naturally in streams or other bodies, and that, too, regardless of any law upon the subject, whether it be the common law of riparian rights, the civil law, or the Arid Region Doctrine of appropriation. * * * Nor can an appropriator lay claim to water which he has permitted to escape and run off, but this is open to the appropriation (use) of others. Water permitted to escape after it has been appropriated by one, and which finds its way into the natural channel of a stream from which it was taken or into the channel of another stream cannot be reclaimed by the original appropriator against subsequent appropriators (users) who have made use of it. *Salt Lake City* v. *Telluride Power Co. et al.,* 82 Utah 607, 17 P. (2d) 281;

Id., 82 Utah 622, 26 P. (2d) 822. But, after the water itself has been actually diverted from the stream, and is taken into the possession of the appropriator in his ditches, canals, or reservoirs, the title to the same changes and it becomes the absolute property of the appropriator." (Parenthetical words added.) Kinney on Irrigation and Water Rights (2d Ed.) vol. II, p. 1339.

Water reaching a stream, lake, pond, artesian area, or other source and constituting a supply (unappropriated public water) from which it may be diverted or drawn and which continues to reach the point of diversion by a movement from a natural source or artificial source so remote as to be considered a natural source of supply ■ in this jurisdiction is subject to the law of appropriation. Laws of Utah 1919, c. 67, §§ 1, 41, now 100-1-1 and 100-3-1, R. S. 1933. In the case of percolating underground water, the course by which it travels or percolates is not seen nor has it any one definitely determinable channel within which it may be said to be confined, until what has sometimes been considered to be its statutory status of "known or defined channel" may be asserted, but its direction is as well known as if it ran in such a channel on the surface. The flow and movement of these subterranean waters is subject to proof, and its direction of movement a matter for determination, and may be determined, although it may be with less certainty than if it ran in a channel on the surface, and its flow is regulated by as ancient and if not quite as well-known invariable natural law as the descent or flow of any superficial stream. Almost all water supplies, except such superficial run-off from areas not sufficiently porous to absorb or take up the precipitation as it falls, have their sources, whether in springs, percolations, artesian areas, lakes, ponds, or streams, through the absorptive and percolating processes of the soil from precipitation and delivery thence to either surface or subterranean sources of supply (immediate or remote), the nomenclature used to denominate them adjusting itself to the size, form, character, or location of the stream or body of water sought to be described.

In a broad sense, all rights to the use of water are acquired by some form of an appropriation, different principles or procedure being applied, depending somewhat upon the legal theory adopted to determine the character, extent, and limitations of the appropriation or use, such as the doctrine of priority, or "first in time, first in right," proprietorship, prescription, or adverse use, correlative rights, or reasonable use where priorities are equal or impossible of determination, thus making them equal; all being limited to the appropriator's needs or the beneficial use to which the appropriation is applied.

This word "appropriation" manifests an unusual persistence of use in water cases, whether used in the discussion of water rights where common-law principles have been applied or under the various doctrines of correlative rights, reasonable use or priority of appropriation.

An interesting discussion is found by Mr. Justice Story in one of the very early American cases where the common-law doctrine of riparian rights was applied, yet certain elements of priority of appropriation intruded themselves, and from some aspects controlled the decision. Reference is made to the case of *Tyler et al.* v. *Wilkinson et al.*, 4 Mason 397, 401, Fed. Cas. No. 14312, decided in 1927:

"The true test of the principle and extent of the use is, whether it is to the injury of the other proprietors or not. There may be a diminution in quantity (consumptive use), or a retardation (storage or reservoiring) or acceleration (drawing off) of the natural current indispensable for the general and valuable use of the water, perfectly consistent with the existence of the common right. The diminution, retardation, or acceleration, not positively and sensibly injurious by diminishing the value of the common right, is an implied element in the right of using the stream at all. The law here, as in many other cases, acts with a reasonable reference to public convenience and general good, and it is not betrayed into a narrow strictness, subversive of common sense, nor into an extravagant looseness, which would destroy private rights. The maxim is applied, '*Sic utere tuo, ut non alienum laedas.*'

"But of a thing, common by nature, there may be an *appropriation* by general consent or grant. Mere *priority of appropriation* of run-

ning water, without such consent or grant, confers no exclusive right. It is not like the case of mere occupancy, where *the first occupant takes by force of his priority of occupancy.* That supposes no ownership already existing, and no right to the use already acquired. But our law annexes to the riparian proprietors the right to the use in common, as an incident to the land; and whoever seeks to found an exclusive use, *must establish a rightful appropriation in some manner known and admitted by the law.* Now, this may be, either by a grant from all the proprietors, whose interest is affected by the particular *appropriation,* or by a long exclusive enjoyment, without interruption, which affords a just presumption of right. * * *" (Italics and words in parentheses added.)

"With these principles in view, the general rights of the plaintiffs cannot admit of much controversy. They are riparian proprietors, and, as such, are entitled to the natural flow of the river without diminution to their injury. As owners of the lower dam, and the mills connected therewith, they have no rights beyond those of any other persons, who might have *appropriated* that portion of the stream to the use of their mills. That is, their rights are to be measured by the extent of their *actual appropriation* and use of the water for a period, which the law deems a conclusive presumption in favor of rights of this nature. In their character as mill owners, they have no title to the flow of the stream beyond the *water actually and legally appropriated* to the mills; but in their character as riparian proprietors, they have annexed to their lands the general flow of the river, so far as it has not been already acquired by some *prior and legally operative appropriation.*

"No doubt, then, can exist as to the right of the plaintiffs to the surplus of the natural flow of the stream *not yet appropriated.* Their rights, as riparian proprietors, are general; and it is incumbent on the parties, who seek to narrow these rights, to establish by competent proofs their own title to *divert and use the stream.*" (Italics added.) Page 402 of 4 Mason, Fed. Cas. No. 14,312, supra.

"If, therefore, we give the fullest effect to this assertion of preeminent right, *it must be limited,* as it was exercised, to the uses of the mills then in existence, that is, *to the usual priority of supply, which, in a conflict of right and a deficiency of water, they were accustomed to take and require.*" (Italics added.) Page 406 of 4 Mason, Fed. Cas. No. 14,312, supra.

When the supply of water equals or exceeds the demand, no questions arise to be litigated; but, when rights conflict and deficiency of supply provokes disputes, the courts are

appealed to for decision. In almost every instance time and quantity are fundamental facts to which the law is applied. Rights are initiated one before another or simultaneously. Where the former situation prevails, priority determines; where the latter, proportions is the rule (sometimes referred to as correlative rights), both being limited by the measure of beneficial use. Priority is sometimes determined by the time of an adverse or prescriptive use, sometimes actual appropriation, sometimes grant. Preliminary legal procedural processes are necessary in the acquiring of a right.

In this state and in the territory preceding statehood, rights to the use of public streams of water were acquired either by an actual diversion and application of the water to a beneficial use, or by legislative grant. A few very early grants, granting to individuals the use of certain streams, were made, none of which seem to have continued to persist. Laws of Utah 1851. Construction of works and use of water beneficially, thereby establishing a right to the use of water and fixing the priority thereof, constituted the procedure from the settlement of the territory until 1897 when a procedure was prescribed by legislative enactment. Laws of Utah 1897, c. 52, § 8.

The framers of the Constitution of the state thought that the rights to the use of water in the state, by whatever method of procedure acquired, were of such gravity and importance that the following article was inserted in the Constitution:

"All existing rights to the use of any of the waters in this State for any useful or beneficial purpose, are hereby recognized and confirmed." Const. Utah, art. 17, § 1.

There were no exceptions made as to surface, subterranean, or percolating waters.

Interesting now only as a matter of history, early grants were made of rights to use water from the streams. The following is illustrative:

"An Ordinance granting the Waters of North Mill Creek Kanyon, and the Waters of the Kanyon next North, to Heber C. Kimball,

"Sec. 1.   Be it ordained by the General Assembly of the State of Deseret: That Heber C. Kimball have the exclusive privilege of conveying the waters of North Mill Creek Kanyon, and the waters of the Kanyon next north, to-wit: About half a mile distant to some convenient point below the mouth of the two kanyons, and of appropriating the same to the use of a saw mill, grist mill, and other machinery.

"Sec. 2.   Nothing herein contained shall prevent the waters aforesaid from being used, whenever and wherever it is necessary for irrigating." Laws of Utah 1851 (passed January 8, approved January 9, 1851).

Prior to the passage of chapter 100, Laws of Utah 1903, the procedure provided by law for the appropriation of unappropriated public waters of the state was provided by title 33, Rev. Stats. 1898, §§ 1268-1275. These sections were brought forward into the Revised Statutes of 1898 from the Session Laws of 1897, c. 52. In so far as our search has disclosed, this law of 1897 constitutes the first law of the state or territory of Utah prescribing a procedure to be followed by any one desiring to appropriate unappropriated public water, except as recognized by diversion and beneficial use. The procedure is now obsolete, but as a matter of the development of a procedure to acquire a right to the use of water, in our judgment, is worth quoting here:

"Sec. 8.   Any person hereafter desiring to appropriate water must post a notice in writing in two conspicuous places, one copy at the nearest post office to the point of intended diversion, and one copy at the point of intended diversion stating therein:

"1st.   The number of cubic feet per second claimed.

"2nd.   The purpose for which it is claimed and the place of intended use, and if for irrigation the number of acres to be irrigated.

"3rd.   The means of diversion, with the size of flume, ditch, pipe or acqueduct, by which he intends to divert it.

"4th.   The date of the appropriation.

"5th.   The name of the appropriator.

"Sec. 9.   Within twenty days after the date of appropriation (presumably intended for application to a beneficial use) the appropriator shall file for record with the county recorder of the county in

which such appropriation is made a notice of appropriation, which, in addition to the facts required to be stated in the posted notice as hereinbefore prescribed, shall contain the name of the stream from which the diversion is made, if such stream have a name, and if it have not, such a description of the stream as will identify it, and an accurate description of the point of diversion on such stream, with reference to some natural object or permanent monument. The notice shall be verified by the affidavit of the appropriator, or some one in his behalf, which affidavit must state that the matters and facts contained in the notice are true. (Parenthetical expression ours.)

"Sec. 10. Within forty days after posting such notice the appropriator must proceed to prosecute the excavation or construction of the work by which the water appropriated is to be diverted, and must prosecute the same with reasonable diligence to completion. If the ditch or flume, when constructed, is inadequate to convey the amount of water claimed in the notice aforesaid, the excess claimed above the capacity of the ditch or flume shall be subject to appropriation by any other person, in accordance with the provisions of this act.

"Sec. 11. A failure to comply with the provisions of this act deprives the appropriator of the right to the use of water as against a subsequent claimant who complies therewith, but by complying with the provisions of this act, the right to the use of the water shall relate back to the date of posting the notice.

"Sec. 12. Persons who have heretofore acquired rights to the use of water may within one year after the approval of this act file for record in the office of the county recorder of the county in which the water right is situated, a declaration in writing (except notice be already given of record as required by this act or a declaration in writing be already filed as required by this section) containing the same facts as required in the notice provided for record in sections eight and nine of this act, and verified as required in section nine, in cases of notice of appropriation of water; *Provided*, that a failure to comply with the requirements of this section shall in no wise work a forfeiture of such heretofore acquired rights, or prevent any such claimant from establishing such rights in the courts."

The procedure prescribed by the law just quoted remained the law until 1903, when the procedure now provided was enacted. Laws of Utah, 1919, c. 67, § 41 et seq., R. S. Utah 1933, 100-3-1 et seq.

Before 1897 no procedure for the initiation or acquiring of a water right had been prescribed by statute and a right acquired or vested by any method prior to that time so long

as applied to a beneficial use was recognized by the statute and subsequently recognized and confirmed by constitutional declaration. Few cases reached the Supreme Court prior to the enactment of the 1897 statute. To those that did, the court, without equivocation, applied the priority of appropriation doctrine, among which were *Munroe* v. *Ivie*, 2 Utah 535; *Crane* v. *Winsor*, 2 Utah 248; *Lehi Irrigation Co.* v. *Moyle*, 4 Utah, 327, 9 P. 867, and definitely repudiated the common-law doctrine of riparian rights, *Stowell* v. *Johnson*, 7 Utah 215, 26 P. 290; *Yates* v. *Newton*, 59 Utah 105, 202 P. 208.

The law generally is that, where no statutory procedure has been prescribed, a right to the use of water may be initiated and consummated by diversion and application to a beneficial use. As said in the case of *Munroe* v. *Ivie*, supra,

"*the appropriation of the water is open to all*, and the legislature cannot pass any law that will put it into the power of an irrigating company to control and manage the waters of any part of the Territory, regardless of the rights of parties." (Italics added.)

As early as 1880, vested rights to the use of water diverted and used were recognized by legislative enactment without other procedural requirements:

"A right to the use of water for any useful purpose, such as for domestic purposes, irrigating lands, propelling machinery, washing and sluicing ores, and other like purposes, is hereby recognized and acknowledged to have vested and accrued, as a primary right, to the extent of, and reasonable necessity for such use thereof, under any of the following circumstances: First—Whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake, or spring, *or other natural source of supply*. Second—Whenever any person or persons shall have the open, peaceable, uninterrupted and continuous use of water for a period of seven years." (Italics added.) Laws of Utah 1880, *c.* 20, § 6.

By common consent and in the nature of the situation the procedure prescribed by statute for the purpose of establish-

ing priority and securing the benefit of the doctrine of rela-
tion before consummation of the right by application
to beneficial use (*Robinson* v. *Schoenfeld*, 62 Utah ■
233, 218 P. 1041; 2 Kinney on Irrigation and Water
Rights [2d Ed.] § 730) by filing an application with the state
engineer, is by some thought not to be applicable for the pur-
pose of initiating a right to the use of subterranean waters
unless "flowing in known or defined channels." We find no
substantial reasons to support such position. First, in the
very nature of the situation either by tunneling or by means
of pipes driven into the earth it may not, with certainty, be
said that any water will be obtained. Such is the practical
aspect of the situation. A test is necessary to determine the
matter. Second, if obtained, the quantity is problematical
and the method of securing the supply if found is variable.
Water may flow from pressure or may have to be pumped.
Third, if and when obtained it may be at the cost of drying
up or diminishing the supply of some one else who has al-
ready established a use, or may affect or diminish a source
already appropriated. Fourth, water may be discovered or
developed that will not come to the surface, nor may it be
determined whether or not other uses may be affected until
tested by pumping or other means by which the discovered
supply may be drawn upon. Fifth, an applicant may not
be expected to declare that there is a specified quantity of
unappropriated public water subject to appropriation in ad-
vance of driving the pipe or tunnel. Sixth, there may or
may not be more than one water bearing stratum separated
by impervious layers. Seventh, the sources may be different.
As many as thirteen separate water bearing strata under
one area have been demonstrated to exist in a known area in
Salt Lake county, Utah. Eighth, it may take time to deter-
mine whether or not vested rights are affected and the extent
thereof.

In the instant case it is alleged that for thirty-five years
prior to the drilling of defendants' wells, the plaintiff's arte-
sian wells have continuously delivered to the surface 15 gal-

lons of water per minute, which plaintiff has applied beneficially to domestic, culinary, and irrigation purposes; that during the fall and winter of 1927 and 1928 the defendants drilled two four-inch wells into the artesian basin, and in the month of July, 1929, installed an electric pump and attached the same to one of said wells, operated said pump and forced to the surface from said wells 180 gallons of water per minute; that, prior to the drilling and pumping of defendants' wells, plaintiff had at all times been able to obtain an ample supply of water from said artesian basin through his own wells for domestic and culinary purposes and for limited irrigation; but that, immediately following the withdrawal by defendants of the water aforesaid, plaintiff's wells decreased in volume and eventually the flow therefrom entirely ceased.

Under the allegations thus made, had plaintiff acquired a vested right, and have the defendants invaded that right? If the principles underlying the doctrine of priority of appropriation, diversion, and application to a beneficial use are applicable, plaintiff has stated a cause of action. In a jurisdiction where the doctrine of acquiring a prior right by appropriation to the use of water beneficially applied for consumptive, or for that matter nonconsumptive, purposes has been adopted, plaintiff's allegations carry his case a long way. Priority of appropriation and use fixes the order in which conflicting rights are to be supplied; beneficial use supports the right and furnishes the basis of maintaining, measuring and limiting the quantity. The initiation of a private right for priority purposes may be very different from a complete vesting of a right followed by use. Often, and especially in equity proceedings, the determination of which of two or more conflicting rights vested first determines the relative rights.

Appropriation, priority admitted or contested, reasonable use, correlative or proportionate rights with varying applications, prescription, and beneficial use, appear in some form of application in the determination of water rights

from the time of *Tyler* v. *Wilkinson,* supra, to the present. In the arid west, appropriation, priority and beneficial use are the expressions emphasized in the cases. The statutory provisions relating to the same matters are interesting and reflect fundamentals as do the decided cases.

At the risk of some repetition of thought and text and in the hope of clearness, references to the provisions of the statutes are here made and quoted. Laws of Utah 1880, c. 20, provide:

Section 6, supra.

"Sec. 7. A *secondary right* to the use of water for any of said purposes is hereby recognized and acknowledged to have vested and accrued (subject to the perfect and complete use of *all primary rights*) to the extent of and reasonable necessity for such use thereof under any of the following circumstances: First—Whenever the whole of the waters of any natural stream, water-course, lake, spring, or other natural source of supply has been taken, diverted and used by appropriators for a part, or parts, of each year only; and other persons *have subsequently appropriated* any part, or the whole, of such water during any other part of such year, such person shall be deemed to have *acquired a secondary right.* Second—Whenever, at the time of an unusual increase of water exceeding seven years' average flow of such water, at the same season of each year, all the water of such average flow then being used by *prior appropriators,* and other persons appropriate and use such increase of water, such persons shall be deemed to have acquired *a secondary right.*

"Sec. 8. A *right to the use of water may be measured by fractional parts of the whole source of supply,* or by such fractional parts, with a limitation as to periods of time when used, or intended to be used; or it may be measured in cubic inches, with limitation specifying the depth, width and declination of the water at point of measurement, and, if necessary, with a further limitation, as to periods of time when used, or intended to be used, and such right may be appurtenant to the land upon which such water is used, or *it may be personal property,* at the option of the rightful owner of such right, and a change of the place of use of water shall in no manner affect the validity of any person's right to use water, but no person shall change the place of use of water, to the damage of his co-owners in such right, without just compensation. * * *

"Sec. 14. Whenever the waters of any natural source of supply *are not sufficient* for the service of all those *having primary rights*

to the use of the same, such water shall be distributed to each owner of such right in proportion to its extent, but those using the water for domestic purposes shall have preference over those claiming for any other purpose, and those using water for irrigating lands shall have preference over those using the same for any other purpose, except domestic purposes. *Provided,* Such preference shall not be exercised to the injury of any vested right, without just compensation for such injury."

Without change, these provisions were carried into Comp. Laws Utah 1888, as §§ 2780, 2781, 2782, and 2787.

A procedure by law for fixing a date of priority prior to the construction of diverting works and beneficially applying the water to a use was first enacted in 1897, chapter 52, supra. Two sections other than those referred to supra, should be here referred to. They provide:

"Sec. 1. The rights to the use of any of the unappropriated waters of the state may be acquired by appropriation.

"Sec. 2. The appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest abandons or ceases to use the water for a period of seven years the right ceases; but questions of abandonment shall be questions of fact, and shall be determined as are other questions of fact."

Sections 1 and 2, Laws of Utah 1897, c. 52, just quoted, became sections 1261 and 1262, Rev. St. 1898, and sections 8 and 9, c. 52, Laws of Utah 1897, supra, became sections 1268 and 1269, Rev. St. 1898.

The statutory procedure relating to the appropriation of water was changed by Laws of Utah 1903, c. 100. Part of that chapter relating to procedure to acquire rights to the use of water, the establishing or fixing priorities, the requirements for the application of water to a beneficial use are:

"Sec. 34. *Rights to Unappropriated Water.* Rights to the use of any of the unappropriated water in the State may be acquired by appropriation, in the manner hereinafter provided, and not otherwise. The appropriation must be for some useful or beneficial purpose, and, as between appropriators, the one first in time shall be first in right."

"Sec. 46. *Priority*. The priority number of such appropriation shall be determined by the date of filing the written application in the State Engineer's Office.

"Sec. 47. *Waters Public Property*. The water of all streams and other sources in this State, whether flowing above or underground, in known or defined channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof."

"Sec. 49. *Beneficial Use*. Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this State."

With some verbal changes the foregoing sections were re-enacted and are included in chapter 108, Laws of Utah 1905—section 34 without change; section 46, the words "date of filing" were changed to date of receiving; section 47 without change; and section 49 without change—and then were re-enacted without change from the 1905 Session Laws, in 1919, and as such have continued with additions and changes until the present time. Section 34, Laws of Utah 1905, became section 41 with additions and changes; section 46 became section 10 with additions and changes; section 47 became section 1, and section 49 became section 3, of chapter 67, Laws of Utah 1919; and these sections now read:

"The water of all streams and other sources in this state, whether flowing above or under the ground in known or defined natural channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof" (100-1-1, R. S. Utah 1933)—the word "natural" being inserted before "channels" and after "defined" in the 1933 Revised Statutes, thus restoring the word as found in an early statute, Laws of Utah 1880, c. 20, § 6.

This provision or declaration first appeared in the Session Laws of 1903, p. 101, and has remained without change except as indicated. The section on beneficial use has come down without change, and now reads,

"Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state." 100-1-3, R. S. 1933.

Other provisions of the statute might be referred to but for the purposes of the discussion at this time it would seem

unnecessary. A number of propositions arising out of the statutory provisions are comparatively clear. First, there is a procedure provided by law by which the initiation of a right to the use of water may be made by application to the state engineer and if followed by application to a beneficial use will establish a prima facie right. Second, a method whereby the date of priority may be established and made a matter of record. Third, a measure whereby the quantity of the appropriation is determined. Fourth, a declaration of relative importance of uses. Fifth, restrictive limitations as to uses and needs.

That all of these matters of procedure, limitation, and use apply to what is commonly denominated superficial streams and certain types of underground streams has never been questioned. Out of the application of these principles in the determination of rights, questions arise where priority may not be involved, either because priorities are waived or may not be determined, prescriptive uses have intervened, estoppels have become effective, or priorities have to be grouped into classes or regarded as equal or simultaneous in a given case, or because of lack of sufficient evidence or impracticability, or for other reasons a rule of decision in certain typical cases known as the rule of proportions, "correlative rights," or "reasonable use," has been applied. The question here is: Do the same rules of law apply to subterranean waters generally as to surface waters, or underground waters "in known or defined natural channels"?

Counsel for both appellant and respondent cite and seem to rely upon the case of *Horne* v. *Utah Oil Refining Company,* supra. In that case, as in the instant case, the issues came to this court upon the question of a judgment of the trial court sustaining a general demurrer to and dismissing the complaint. This court in the Horne Case, speaking with reference to the complaint, at page 287 of 59 Utah, 202 P. 815, 818, said:

"While the complaint alleges the beneficial use of the water long prior to the alleged wrongs complained of, we do not understand that plaintiffs base their claim of right upon the law of appropriation.

*There is no allegation in the complaint from which it may be inferred that plaintiffs may make any such claim. If it could be inferred that such was intended as the basis of their claim, we would feel compelled to hold that the complaint does not state facts sufficient to sustain a right of that nature. There is nothing whatever to show that the water in question was the subject of appropriation under any law which recognizes the doctrine of 'First in time, first in right.'* Rather does it appear, notwithstanding their allegation of priority, that plaintiffs base their right upon their ownership of the land upon which their wells were driven, which land, in common with that of defendant, constitutes an artesian district beneath the surface of which exists the water in controversy under a superimposed cap layer or stratum of impervious material." (Italics added.)

It is something more than difficult to fully harmonize the italicized portion of the above quotation with the other parts of it where the doctrine of priority of appropriation is the general law upon water rights except that the parties have submitted the matter to the court upon another theory. The court then says:

*"Not only is it alleged in the complaint that all of said lands are within the artesian district, and that the flow of water from defendant's wells diminishes the flow from plaintiff's wells,* but defendant, in its brief filed in the case, makes the following statement:

" 'The pleadings in this case show, and it is an admitted truth, that the waters in controversy are underground percolating waters, which percolate underneath, in, and through the lands of each of the plaintiffs, and the defendant, respectively.' " (Italics added.)

The court then proceeds to say that it is "inclined to adopt the view" of the defendant, that the waters, while in the ground, are what are known as "percolating" waters, and, "with this conclusion as a basis for its contention, defendant makes the point that the waters thus percolating through and underneath its land cannot be distinguished from the soil itself," and that therefore the doctrine of reasonable use applies and inferentially excludes the application of any other doctrine. Then finally recurring and without further comment as to the allegations of the complaint, the court at page 294 of 59 Utah, 202 P. 815, 821, says:

"Assuming that the doctrine enunciated in the Walkinshaw Case is a sound exposition of the law applicable to conditions existing in this jurisdiction, then it must be conceded that the complaint in the instant case tested by the rule laid down in the fourth paragraph last above quoted meets every requirement and states a cause of action for equitable relief,"

and at page 302 of 59 Utah, 202 P. 815, 824, the court further says:

"Before concluding the discussion as to whether the complaint in this case states a cause of action for equitable relief, the writer feels impressed to say *he has no substantial doubt as to the justice and equity of the doctrine of reasonable use of percolating waters* as between adjoining owners; but as to what constitutes a reasonable use the authorities are not as clear as might be desired. *They seem to dwell mostly upon the point that it is not a reasonable use to convey the water away from the land in which it is found.*" (Italics added.)

This latter doctrine was repudiated in this jurisdiction by the Glover Case, supra:

The court then passes from the questions involved in the above-quoted statements and limits the doctrine of reasonable use to a specific rule for the measurement of the use by using the proportionate area belonging to parties whose land overlies the underground supply and concludes:

"It seems * * * that the use of the water by an adjoining owner, to be a reasonable use, especially in an artesian district, should be limited first to his just proportion according to his surface area, and, second, he should not be entitled even to this quantity to the injury of others similarly situated, unless it is reasonably necessary for the beneficial purposes to which he devotes the water."

An examination of the discussions relating to underground waters, when compared with the statutes, conditions, and development in arid region water determinations, reveals a struggle, an assumption and some distinctions based upon the assumption. The assumption, because of the common-law maxim, *"Cujus est solum ejus est usque ad coelum et ad inferos,"* or "To whom the soil belongs, he owns also to the sky and to the depths," is that "percolating" water is a part

of the soil and therefore the owner of the land owns the water percolating therein, and may take it therefrom at his pleasure, whether or not such taking injures an adjoining landowner or prior appropriator, such drawing off of water from neighboring land being *damnum absque injuria.*

This, broadly speaking, is the English rule. It originated in England where the climate is wet and there was ordinarily water enough for all, and the practical question was most often how to get rid of the water rather than its application to a beneficial use, except where mills had been built upon streams and riparian proprietors objected to the river sources being depleted by the withdrawal of underground waters. The English rule treats rights to percolating water as part of the soil itself, so that the owner of one tract of land is permitted to draw off the water found in his own land, even for sale for distant or alien uses, although the effect is to destroy the well or springs upon the lands owned by others. *Acton* v. *Blundell,* 12 Mus. & W. 324, 13 L. J. Exch. (N. S.) 289, is cited as the leading English case on the subject, although the court indicated that it would not intimate as to what the opinion might be had there been an uninterrupted user of the right for more than twenty years. The case of *Chasemore* v. *Richards,* 7 H. L. Cas. 349, 29 L. J. Exch. N. S. 81, followed the case of *Acton* v. *Blundell.* However, Coleridge, J., wrote a dissenting opinion more nearly in harmony with later arid region discussion on the subject. A number of American cases, it is maintained, support the same proposition. A number of those cases are cited, discussed and distinguished in the Horne Case. Among them are a number of Utah cases, and, in discussing and giving such application to them as seems proper, the court said:

"In the case of *Crescent Mining Co.* v. *Silver King Min. Co.* [17 Utah 144, 54 P. 244, 70 Am. St. Rep. 810], supra, it was held that the owner of the land in which water is found in a percolating state is the owner of the water, and can apply it to his own use whenever he wishes—a doctrine which, under the facts of that case, is uncontrovertible, and no attempt has ever been made to controvert it in any subsequent case. Let it be borne in mind,

however, that *in that case no one claimed a prior right to the water by virtue of a prior appropriation under the federal laws or laws of the state*, nor was it a case in which the Crescent Company could claim a right by virtue of any sort of interest in common with the defendant Silver King Company. If the Crescent Company had owned a right to the water by prior appropriation under some law authorizing appropriation, as in the case of *Sullivan* v. *Mining Co.*, 11 Utah 438, 40 P. 709, 30 L. R. A. 186, or in *Stowel* v. *Johnson*, 7 Utah 215, 26 P. 290, in which a question analogous in principle was determined by the court, or a right in common as above stated, a different case would have been presented, resulting, perhaps, in a different determination."

The following cases are then discussed: *Willow Creek Irr. Co.* v. *Michaelson*, 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687; *Herriman Irr. Co.* v. *Keel*, 25 Utah 96, 69 P. 719; *Rasmussen* v. *Moroni Irr. Co.*, 56 Utah 140, 189 P. 572; *Mountain Lake Min. Co.* v. *Midway Irr. Co. et al.*, 4 Utah 371, 154 P. 584; *Bastian* v. *Nebeker*, 49 Utah 390, 163 P. 1092; *Peterson* v. *Lund*, 57 Utah 162, 193 P. 1087; and *Stookey* v. *Green*, 53 Utah 311, 178 P. 586—and declared that the effect of the holding of cases is that

"the common-law doctrine, both as to riparian rights and percolating water, are inapplicable to conditions existing in this jurisdiction, and cannot prevail as against a right acquired by prior appropriation."

This court has declared repeatedly that the doctrine of riparian rights has never been recognized in this state. It is not necessary to again cite the cases. While percolating water may be and usually is related to the source of a stream upon which riparian proprietors may be located, there would not seem to be any necessary relation between the doctrine of riparian rights and either subterranean waters flowing as sometimes referred to in known or defined channels or percolating through the soil. Some cases argue otherwise. Any phase of the problem of water may be said to be related to the soil if the course of the supply be traced from the point of use to the source whence it came. It seems clear, however, from the cases, therefore, that neither the common law relating to riparian rights

nor the so-called English rule of percolating or underground waters has recognition in this state. And that, too, without to any practical extent interfering with a landowner's right of use of his own land, aside from drawing therefrom water that will sensibly or appreciably diminish or deplete a prior appropriator's quantity appropriated and used. In matters of common right when the quantity is limited and the source is traceable into lands, public or private, and especially the latter, conflicting rights may arise and different principles of law may by different authorities be thought to be applicable. But when common rights meet and neither may totally prevail, some principle that will meet the test in harmony with development and will allow the adoption of the principle that will aid in promoting the greatest good and will impose the least burdens, demands recognition. A landowner under whose land there exists a source of supply may draw therefrom to the full supply of his needs as long as no prior appropriator's supply is appreciably or sensibly diminished; but, when rights have vested, there may not then be a, diminution of the natural supply by cutting off at or near the source a quantity sufficiently appreciable to visibly diminish in quantity a prior appropriation or use to the injury of the appropriator or user. A diminution not sufficiently appreciable to be positively injurious by affecting the value or use of the common right in the use of any stream is not actionable. Thus one may ordinarily go to any public stream and dip therefrom a cup or a bucket of water for drinking purposes though the stream were completely appropriated, without either appreciable injury or affecting any fundamental right. Must not the law here be the same as in other cases? The acts must be interpreted and limited by a reasonable reference to what is for the public good, convenience, and general welfare, without being betrayed into a narrow strictness on the one hand or a looseness at variance with common sense on the other which would utterly destroy the common right and likewise the private right growing therefrom.

This brings us to the questions of "correlative rights" and "reasonable use." The questions of "correlative rights" and "reasonable use" have occupied the attention of the courts for a long time, and different cases in different jurisdictions, and different cases in the same jurisdiction, have made distinctions, and applied the doctrines to the cases in such way as to make the final distinctions largely a matter of jurisdiction in which the case is decided.

Mr. Kinney in his excellent work on Irrigation and Water Rights, at § 1192 of volume II (2d Ed.) in drawing the distinction referred to, says:

"It must be noted that there is a distinction between the English rule as modified by the modern American rule of reasonable use and the rule of correlative rights. Under the rule of reasonable use some of the authorities hold that a land owner has a right to make such a beneficial use of the water found percolating through his land to the extent that may be necessary for the improvement of his land, *so long as used thereon*, although in so doing he may drain the lands of his neighbors. Upon the other hand, the rule of correlative rights to these owners is the rule which abrogates the English rule as to these waters and holds that the rights of all land owners over a common basin, saturated strata, or underground reservoir, are *co-equal or correlative*, and that one land owner cannot extract more than his share of the water even for use on his own lands, when the rights of others are injured thereby." (Italics added.)

Mr. Justice Thurman in the Horne Case reviews at considerable length the cases and the doctrines for which they respectively stand. No good purpose could be served by repeating the excellent review of the cases referred to by Mr. Justice Thurman in the Horne Case. With his usual comprehensive grasp of the principles involved in matters relating to the problems discussed in the cases cited and referred to, he concludes with the significant statement that

"he has no substantial doubt as to the justice and equity of the doctrine of reasonable use of percolating waters as between adjoining owners; but as to what constitutes a reasonable use the authorities are not as clear as might be desired."

In some of the cases the statements "correlative right" and "reasonable use" seem to be used interchangeably. Regardless of the distinctions drawn by the cases or text-writers on the subject and whether or not the different theories may exist side by side in the same jurisdiction, they may form the basis for an interesting and maybe learned discussion; but, where a given principle has been early declared by statute and consistently adhered to, such must be of controlling force in cases where the statute is applicable.

"Under the new cases, percolating water, like running water, is now said, in its natural state, to belong to no one, or 'belongs to the public', or 'at least, to that portion of the public who may own the surface of the soil', or 'belongs to the community' or 'is stored by nature for the community' as 'a common supply'. There is little difference between this and the law as to *running water*, which the law holds to be 'common' and not the subject of individual ownership while in its natural condition." Wiel, Water Rights (3d Ed.) vol. II, p. 1040, § 1100, and cases cited in support of the text.

In the last analysis, "correlative rights," "reasonable use," and cognate expressions seem to mean no more than that there exists a common coequal right; but up to the present no fixed measure or standard of measure seems to have been found of general application. The statutory declaration on the matter now and for some time prevailing in this jurisdiction is in harmony with the cases supporting the declaration of unappropriated water being the property of the public.

"The water of all streams and other sources in this state, whether flowing above or under the ground in known or defined natural channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof." 100-1-1, R. S. 1933.

Appropriation and priority of right of appropriation have always been rescognized in this state; likewise the reasonable use thereof as determined by the necessities measured by the beneficial use have been recognized as limitations upon the appropriation. So far as we have been able to discover, "priority of right" once determined has always been

controlling. There have been cases and no doubt will be more where priority has been waived, recognized as equal, or simultaneous or sufficiently simultaneous to be so regarded, or the respective priorities have been found to be impossible of determination, or for practical reasons, where the parties litigant have been numerous, and the appropriations have fallen within periods requiring a grouping of appropriators as to priorities, and necessitating the application of the rule of reasonable use among those having an equal priority or when the priority question did not exist, the rule of correlative rights or proportionate distribution or use in accord with the doctrine of law of reasonable use has been applied.

The Horne Case was a case of the type where it appears the question of priority of appropriation was not involved; hence the application of the "correlative rights" rule. In that case the application of the reasonable use rule became a necessity, and as we now view that case where the expression "correlative rights" is used, except with reference to a doctrine referred to in another case, the expression was used either as the equivalent of "reasonable use" or was inadvertently used. The limitations placed upon the court's decision by the pleadings, stipulations, and theory upon which the case was presented are partly reflected in the court's statement at page 305 of 59 Utah, 202 P. 815, 825:

"This case is not in condition to adjust the correlative rights of each of the parties as to any specific quantity. The most that can be done is to lay down a rule by which the respective rights [quantities] of the parties can be determined."

The ruling, however, in the Horne Case we now think needs, in the light of further development and application, further consideration. On page 202 of the opinion in 59 Utah, 202 P. 815, 824, it is said:

"It seems to me that the use of the water by an adjoining owner, to be a reasonable use, especially in an artesian district, should be limited *first to his just proportion according to his surface area,* and, second, he should not be entitled even to this quantity to the in-

jury of others similarly situated, unless it is reasonably necessary for the beneficial purposes to which he devotes the water." (Italics added.)

Had the words, "according to his surface area" been omitted, the rights would have been determined according to the law. Surface area, however, has no uniform relation or applicability to the basis or the measure or the limit of a beneficial use.

In a situation where priority of rights is not involved, such as the Horne Case, and reasonable use or beneficial use of necessity must be resorted to, there are so many circumstances where the surface area limitation of a right would work hardship, injustice, or would be inapplicable so entirely as to make it impractical, and in addition the surface area rule seems incompatible with reasonable or beneficial use. A few of the many suggestions that might be offered are: It is seldom that the exact area of an underground source has been determined. It is seldom that surface area bears any direct relationship to necessities or beneficial use; this is most often true as to culinary and domestic uses or commercial uses. Often, as hereinbefore indicated, there are numerous subterranean water bearing strata under one surface area. Part of the beneficial area in the event of irrigation may be within the part outside of the artesian or subsaturated area. Such a measure may deprive an owner or owners on higher levels of his or their share, unless pumping be resorted to, which, in the event demand exceeds supply, may force all to pumping, to the ultimate exhaustion of the supply. Without multiplying reasons, many more probably more potent and applicable will occur to the reader; we deem sufficient has been said at least to indicate the inapplicability of the surface area rule for measuring proportions based upon beneficial use. These reasons, and others that might be suggested, require departure from the surface area or proportionate surface area rule as a measure for determining the quantity of water that an owner may draw or the quantity that must be held

subject to be drawn upon, although such underground water may never be finally applied to a beneficial use by a landowner whether the water be surface or subterranean. In this state, reasonable use, or beneficial use limited by reason, if synonymous, or do with the same limitations define or determine the measure of use, is the fundamental factor in the measurement of a right to the use of water.

As early as 1880 the Legislature recognized vested rights to the use of water and declared:

"A right to the use of water for any *useful purpose* * * * is hereby recognized and acknowledged to have vested and accrued, as a primary right, *to the extent of, and reasonable necessity for such use thereof*, under any of the following circumstances: First—Whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake, or spring *or other natural source of supply*." (Italics added.) Laws of Utah 1880, c. 20, § 6.

Such has been and now is the declared policy of the law of Utah as to the measure of the right of an appropriator of water from any natural source. Appropriators from a given natural source have in this jurisdiction been limited by their respective priorities among themselves, and each of such prior appropriators has been held to be entitled to receive the full amount of his appropriation before any subsequent appropriator was entitled to have any. Similarly the statutes have provided that, whenever the natural flow of a stream had receded to what was denominated the low-water stage, then all of the appropriators who had made appropriations, the total of which did not exceed the flow at the low-water stage, were deemed of equal priority and such supply was then required to be apportioned pro rata among the users based upon quantity of their respective appropriations, and not according to surface area unless perchance the surface area happened to measure the appropriation or be identical with the fractional part or rotating period in the distribution of the water. Laws of Utah 1903, c. 100, § 54; Laws of Utah 1919, c. 67, § 10.

The appropriation must be for some useful and beneficial purpose (Laws of Utah 1919, c. 67, § 41), and the "beneficial use" to which the appropriation is to be applied "shall be the basis, the measure and the limit of all rights to the use of water in this State." Laws of Utah 1919, c. 67, § 3, now 100-1-3, R. S. 1933.

We are therefore convinced that, in measuring an appropriation for a useful purpose to which water may be applied in this state, the Legislature has provided the measure by statute, and we may not adopt another. Any beneficial use must be reasonable. The law of this state as to the use of water tolerates nothing that is unreasonable. To permit an adjoining landowner to drive a well and by natural flow or by pumping or otherwise dry up a neighbor's well that had been driven and used for over thirty-five years invades the right of the neighbor, destroys his prior appropriation, injures his vested and recognized right, is actionable, or, if not, he whose right is thus invaded may still pray for rain, and unless Providence be kinder than courts of law, he is without remedy.

The law, as heretofore indicated, providing a procedure for the appropriation of water, although the declaration of its public character would seem to be broad enough to include subterranean waters, has never been construed nor practically recognized as applicable to subterranean waters, notwithstanding the statute (section 41, c. 67, Laws of Utah 1919) provides:

"Rights to the use of the unappropriated public water in the State may be acquired by appropriation, in the manner hereinafter provided, and not otherwise." Now 100-3-1, R. S. 1933.

We have heretofore seen that, by the modern trend of cases, subterranean percolating water is recognized as public water and, if unappropriated, is subject to appropriation. See Wiel on Water Rights, vol. I, § 4, cases cited, and historical discussion. The statutory declaration that "The water of all streams and other sources in this

State * * * is hereby declared to be the property of the public" does not vest in the state title or ownership of the water as a proprietor. It is a community right available to all upon compliance with the law by which that which was once common to all may be brought within the domain of private right to use, or under certain circumstances private and exclusive possession and ownership.

Wherever water is subject to appropriation, and priorities of use have been lawfully established and maintained, thereby and of necessity correlative rights in so far as prior appropriations are concerned have been subjected to such rights. To argue otherwise or to maintain that each owner of land over an artesian basin has an equal or correlative right to tap the basin at his pleasure and draw therefrom his proportion regardless of the priorities, uses, investments, or reliances thereon, is to convert what is denominated a correlative or coequal right into a weapon of depletion, to the ultimate destruction of all beneficial use, and though the right may continue to exist, has become valueless. How may an equitable balance be maintained under such a system, and especially when the supply is not known? An owner of land within an area where flowing wells or pump wells may be obtainable under the correlative rights doctrine may extract "his just proportion," but he cannot take "this quantity to the injury of others" unless it is "reasonably necessary" (*Horne* v. *Utah Oil Refining Company*, supra), but, if reasonably necessary, he may and each may extract his share of the water for use upon his own lands (in its most limited application), down to the limit until beneficial use is destroyed entirely, and without thought or concern about his neighbor, or without thought or concern as to the quantity of supply except probably the cost of obtaining it as each drives his well and draws his proportion until some one's supply is diminished or entirely cut off. So long as there is a supply sufficient within the area to satisfy all needs, every one is happy. Such is not the situation that brings parties litigant before the courts. Before the litigation stage

is reached, pumping or other practical means of securing the supply are usually resorted to, and the race of the pumps is on. As said in the case of *Forbell* v. *City of New York*, 164 N. Y. 522, 58 N. E. 644, 646, 51 L. R. A. 695, 79 Am. St. Rep. 666:

"It is not unreasonable, so far as it is now apparent to us, that he should dig wells and take therefrom all the water that he needs in order to the fullest enjoyment and usefulness of his land as land, either for purposes of pleasure, abode, productiveness of soil, trade, manufacture, or for whatever else the land as land may serve. He may consume it, but must not discharge it to the injury of others. But to fit it up with wells and pumps of such pervasive and potential reach that from their base the defendant can tap the water stored in the plaintiff's land, and in all the region thereabout, and lead it to his own land, and by merchandising it prevent its return, is, however reasonable it may appear to the defendant and its customers, unreasonable as to the plaintiff and the others whose lands are thus clandestinely sapped, and their value impaired."

Such is the practical result of the application of the doctrine, and further in the same opinion the court said:

"It seems to pervert just rules to unjust purposes. It does wrong under the letter of the law, in defiance of its spirit."

While the New York court adhered to the rule of correlative rights as usually understood, it practically modified it in the Forbell Case and in different terminology, "than priority of appropriation and beneficial use," did justice, and such difficulties could all have been avoided, and the apparent unreasonableness of conflicting principles as viewed through the interests of contending litigants might have been avoided, by adopting the rule as well as the doctrine of priority of appropriation as limited by the application of beneficial use reasonably applied. In many of the cases had the courts not felt bound by a rule of real property, substantially the same results could have been obtained by the application of the doctrine of priority of appropriation and beneficial use. This it seems to us is true of such cases as *Katz* v. *Walkinshaw*, supra; *Cohen* v. *La Canada Land & Water Co.*, 142 Cal.

437, 76 P. 47; *Barclay* v. *Abraham,* 121 Iowa 619, 96 N. W. 1080, 64 L. R. A. 255, 100 Am. St. Rep. 365. A numerous list of like cases might be collected. The cases referred to will illustrate the lines of argument and refer to many of the cases in which by a mere substitution of terms applicable to appropriation would produce substantially the same result and without doing violence to either principle or argument, or statutory enactment.

Since the decisions rendered in the early cases much has been learned about the nature, character, and extent of underground water. New methods of reaching the source and causing it to be produced at a point of use have been applied. It is impossible to put one's finger upon the whole source of supply of a spring, a flowing well, or the exact point in the soil or earth, where what may be termed the water of crystallization ceases to be diffused water, or where diffused water of the soil passes into a sufficiently collected flow to be called "percolating water," or where the flow of percolating water becomes a stream. Between the point of absorption and the clearly identifiable stream, the process is too gradual to specify conditions with particularity. But when an appropriator has a supply and suddenly such supply is cut off, coincident with another in the same area developing a supply, and upon the closing of the subsequently developed supply the former supply returns, the connection is not a matter of conjecture, though a matter of evidence.

The statute announces, "the water of all streams and other sources in this State, whether flowing above or under the ground, in known or defined channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof." Laws of Utah 1919, c. 67, § 1, p. 177, now 100-1-1, R. S. 1933. Keeping in mind at least two rules of statutory construction, first, if possible, every word and phrase of a statute must be given effect, and no words shall be rejected if possible to retain them and give them effect and meaning; and, second, the intent of the Legislature must be ascertained and given effect, which in-

tent and meaning is to be determined primarily from the language of the statutes themselves, recognizing that in so doing it is not proper to consider a word or phrase disconnected from other parts of the act and recognizing that words and phrases must be given their ordinary meaning, unless it is necessary to give to particular words or phrases a restricted or an enlarged meaning so as to harmonize all the provisions of the statute and make them effective. Also keeping in mind the purpose for which the statute was enacted, let us make an analysis of the above statutory provision. If the statute read, "the water of all streams and other sources in this State * * *· is hereby declared to be the property of the public," etc., no possible construction of the statute could be made that would add to the all-inclusiveness of the statement as to subject-matter. How large or how small a flow of water may be required to be to constitute a stream in so far as the minimum is concerned, calls for a refinement not necessary to be made here. If too small to be called a stream, if the flow or movement thereof contribute to the formation of a stream, it could not be excluded from the term "other sources." Had the purpose of the statute been to limit the declaration to surface streams or sources with no further declaration, such a classification could reasonably be made without doing violence. Such construction, however, is precluded by the further declaration "whether flowing above or under the ground." Then all water whether flowing above or under the ground, and whether "percolating" or flowing in underground streams by the statute is declared to be the property of the public. Lakes, or ponds, springs, or seeps above ground, have been recognized as sources of supply whether feeding streams or taken directly therefrom, and such would be included in the provisions of the statute whether surface or subterranean. Because a lake, a stream, a saturated area, an artesian basin, or other source of supply is under the ground does not exclude it from "other sources of supply." Would it change the meaning of the section if the words deleted from the sentence for the pur-

pose of this analysis, "whether flowing above or under the ground in known or defined natural channels," were otherwise placed in the sentence, such as: The water of all streams and other sources in this state is hereby declared to be the property of the public, whether flowing above or under the ground in known or defined channels? We do not perceive that the transposition would alter the meaning and does not improve the composition.

Expanding the statutory declaration and supplying the understood words and the omitted words, the section would read:

"The water of all streams (of water) and other sources (of water) in this State, whether (or not such water is) flowing above (the ground) or under the ground, (and whether or not such water is flowing) in known (channels) or (in) defined natural channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof."

It may be argued that the section could have been condensed into the expression. "The water of all streams and other sources in this State, is hereby declared to be the property of the public, subject to all existing rights to the use thereof," and that so rendered it is all-inclusive and the balance is surplusage. But knowing that the appropriation and use of surface water was first developed and knowing further that surface streams were supplied from underground sources and knowing that some water was drawn direct from such sources as lakes, ponds, "artesian basins," and possibly other sources, the Legislature, in order to make it certain and clear that the statute was intended to include underground waters as well, made the clause "whether flowing above or under the ground in known or defined channels" do duty to prevent such a limitation as might subject the section to a more limited application, for the further purpose of emphasizing that all flowing waters were included. The section evidently includes all public or unappropriated water that *flows*. And such would seem to be the only limitation that should be imposed. Such is the

water that is subject to appropriation and use, being subject at all times to the existing rights to the use thereof.

Whether or not "water flowing under the ground" is synonymous with or equivalent to "flow of percolating waters" (*Sullivan* v. *Northern Spy Min. Co.*, 11 Utah 438, 40 P. 709, 30 L. R. A. 186), "percolating waters which collected in a tunnel" (*Crescent Min. Co.* v. *Silver King Min. Co.*, 17 Utah 444, 54 P. 244, 70 Am. St. Rep. 810), "percolations spread in every direction through the earth, and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land" (*Wheatley* v. *Baugh*, 25 Pa. 528, 64 Am. Dec. 721), "waters thus percolating through and underneath its land cannot be distinguished from the soil itself," "reasonable use of percolating waters as between adjoining owners" (*Horne* v. *Utah Oil Refining Co.*, supra), "the waters of the springs are therefore percolating waters" (*Deseret Live Stock Co.* v. *Hooppiania*, supra), it is not necessary for us in the light of the statute to determine, as in either instance the quantity, nature, or direction of the flow is a matter of proof. The proof may or may not be difficult; but the difficulty of proving whether or not water flows, the direction and quantity thereof, furnishes no good reason why the law as expressly declared by the statute should be questioned nor any excuse for the court to question the law or desire to avoid the responsibility of applying it.

While much has been said about the nature and classification of underground waters, after all, the question is a simple one. If the water "flowing under the ground" is a part of the soil, argument about who should be entitled to it is set at rest by applying the common law as to the ownership of the land. While, if the statute means what our analysis of it convinces us that it does, then the water *"flowing under the ground" is "the property of the public,* subject to all existing rights thereto." That the common law as to the use of waters whether flowing above or under the ground has been rejected in toto as to certain parts of it and greatly modified if not

rejected as to others in this jurisdiction, is settled beyond controversy. Cases need not be cited to support that position. Let it be conceded for argument's sake that in some modified form some adherence thereto may have been attempted. Trouble is at once encountered, and, though many applications have been made, each case presents difficult questions of solution, and sui generis decisions by way of reservation have been made. Once a departure from or modification of the common-law rule has been made, as has been done in most of the states, we see no place for us to stop short of the rule of prior appropriation. The later cases in arid regions are tending strongly towards the doctrine of appropriation and priority of use as the surest safeguard of rights to the use of water. It is the most certain in application and is supported by the statute, sound reason, and correct principle.

"No doctrine better settled, than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes not only such laws as are inconsistent with the spirit of our institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself, to apply a rule founded on a particular reason, to a case, where that reason utterly fails. Cessante ratigone legis, cessat ipsa lex." *Starr* v. *Child*, 20 Wend. (N. Y.) 149, at page 159.

The foregoing is a part of the dissenting opinion of Mr. Justice Bronson. The question involved in the case was one arising out of a situation where a conveyance of premises on the bank of a stream, not navigable, the lines were stated to run from one of the corners of the lot *to the river* and thence along the shore of the river to a certain street. The question was: Does the grantee take *ad filum aquae* (to the thread of the stream)? It was held the grantee did; Bronson dissenting.

Mr. Justice Bronson's statement above quoted has been approved in *People* v. *Canal Appraisers*, 33 N. Y. 461; *Katz* v. *Walkinshaw*, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L. R. A.

236, 99 Am. St. Rep. 35; *Midway Irr. Co.* v. *Snake Creek Min. & Tunnel Co.* (C. C. A.) 271 F. 157, 162. In the case of *Midway Irr. Co.* v. *Snake Creek M. & T. Co.*, supra, the federal court said:

"The conditions in the Western mountain states, where the lands are practically arid, and therefore agricultural products can only be raised by the aid of irrigation, differ materially from those prevailing in England and therefore, unless the Supreme Court of Utah has adopted the so-called English rule, we do not deem it a proper rule to be applied in that state. It has been so held by the courts of the states where similar conditions prevail as in the state of Utah. *Katz* v. *Walkinshaw* [supra]; *McClintock* v. *Hudson*, 141 Cal. 275, 74 P. 849; *Los Angeles* v. *Hunter*, 156 Cal. 603, 105 P. 755; *Comstock* v. *Ramsay*, 55 Colo. 244, 133 P. 1107; Wiel on Water Rights (3d Ed.) §§ 1063 and 1066; 2 Kinney on Water Rights, §§ 1193, 1194."

From what has been said concerning the nature and public character of underground or subterranean waters, and if such character brings them within the classification of unappropriated public waters, subject to all existing rights to the use thereof, then under the construction given to section 41, c. 67, Laws of Utah 1919, now 100-3-1, R. S. 1933, and especially to the last three words of the first sentence of the section, in the case of *Deseret Live Stock Co.* v. *Hooppiania,* supra, no lawful appropriation has been made of artesian or subterranean waters for the appropriation of which no application has been made to the office of the state engineer since the passage of the statute in 1903. To avoid such a situation, it would seem to require a further examination of the statute as construed by the Hooppiania Case. The opinion in that case is a lengthy one. The prevailing opinion of Mr. Chief Justice Gideon was concurred in by Mr. Justice Cherry without comment. Mr. Justice Thurman delivered a concurring opinion discussing at considerable length the section of the statute and particularly the words, "and not otherwise." Mr. Justice Straup delivered a dissenting opinion, with which Mr. Justice Frick in a separate opinion concurred. The high esteem, profound respect in which the learning and ability of these justices of this court are and

have been held, by bench and bar, forces an approach to the discussion of the subject involved weighted with a feeling of temerity and a sense of responsibility more than usual; and, were it not for the fact that an apparently irreconcilable situation would be, as it were, left hanging in the air, demanding determination at the first opportunity, it would be a decided relief to avoid the discussion at this time. Lapse of time, however, will not lessen the responsibility nor make less complicated nor less important the necessity of a declaration of the position of the court upon the question.

That part of the prevailing opinion relating to the construction and effect of the words "and not otherwise" is as follows:

"Chapter 67, Laws Utah 1919, relates to water and water rights. The act is designated as 'An act defining general provisions concerning water and water rights, the appropriation, administration,' etc., and amends some prior laws. Section 41 of that chapter, so far as material here, provides:

" 'Rights to the use of the unappropriated public water in the state may be acquired by appropriation, in the manner hereinafter provided, *and not otherwise.*' (Italics ours.)

"The section further provides that the appropriation must be for a beneficial purpose, and that as between two appropriators the one first in time shall be first in right. The section following that (42) provides that any one entitled to appropriate the unappropriated public waters of the state 'shall, before commencing the construction, enlargement or extension of any ditch, canal, or other distributing works, or performing similar work tending to acquire the said right of appropriation, make an application in writing to the state engineer.' The language of section 41, supra, is apparently susceptible of but one construction, especially when considered in connection with the following sections of the act, and with the purpose sought to be accomplished by the legislation. It is, however, vigorously contended by counsel for appellant, as I understand their argument, that the method of appropriation prescribed by the statute is not exclusive; that the mere filing of the application in the state engineer's office is not, in and of itself, an appropriation of water; that an appropriation of water is made by the actual diversion of the water from its natural source and its application to some beneficial use, and that when that is done there is a completed appropriation, and that until such actual application is made there is no appropria-

tion. The court found that respondent Hooppiania had, prior to April 25, 1918, actually diverted and carried this water to his homestead and applied it to a beneficial use. It is therefore contended, based upon that finding, that the respondent is entitled to a reasonable time thereafter in which to make application to the state engineer for an order allowing or approving the appropriation theretofore made. It may be conceded, and we think no one will contend to the contrary, that the mere act of filing an application in the state engineer's office is not an appropriation of water; that the appropriation is not complete until the water has been actually applied to a beneficial use. But does the fact that the actual application to a beneficial use is necessary for a completed appropriation affect or control the method or means by which such appropriation is initiated? That is what we are required to determine in this case in view of the language of section 41 herein quoted.

"In the early settlement of Utah the same policy or rule of law applied to the appropriation of the public waters as prevailed in other arid states, namely, first in time, first in right. The first Utah legislative act, so far as I have been able to ascertain, respecting the method or mode of appropriating water, was passed by the Legislature of 1897 (Laws 1897, c. 52). Prior to that legislation there had been some acts requiring that notices be recorded in the several county recorders' offices of appropriations actually made. These recording acts did not, however, undertake to point out any particular mode of making the appropriations. By the act of 1897 any person desiring thereafter to appropriate water was required to post notices in writing in two conspicuous places, one at the post office nearest the point of intended diversion, and the other at the point of intended diversion. The statute further provided certain things to be stated in those posted notices, and also provided for the recording of the notices of appropriation, and specified certain additional facts to be stated in the recorded notices. Apparently no other or further legislation was enacted respecting the appropriation of water until 1903 (Laws 1903, c. 100). The Legislature in that year incorporated in the act relating to water rights and irrigation section 41 as the same appears in chapter 67, Laws Utah 1919. Numerous amendments were made to the irrigation laws of this state by the Legislatures meeting since 1903, but in none of such legislation has the method or manner of appropriating water as prescribed by the Legislature of 1903 been changed or modified.

"The states of Wyoming, Idaho, and Montana have enacted legislation respecting the manner of appropriating the public waters of those states. Idaho and Wyoming and possibly Montana, formerly had statutes similar to our act of 1897. There is later legislation in

each of those states respecting the method of appropriating water. The Supreme Court of Wyoming and the Supreme Court of Idaho have held, both under the former and present statutes of those states, that the method prescribed is not exclusive (but see *Wyoming Hereford Ranch* v. *Hammond Packing Co. et al.*, 33 Wyo. 14, 236 P. 764, decided May 19, 1925, while *Deseret Live Stock Co.* v. *Hooppiania*, 66 Utah 25, 239 P. 479, was decided May 29, 1925), that the appropriation of the water for a beneficial use by actually diverting and applying it to such use is a completed appropriation, and, as such, constitutes a valid appropriation as against one filing an application subsequent to the date of the completed appropriation. *Pyke* v. *Burnside*, 8 Idaho 487, 69 P. 477; *Furey* v. *Taylor*, 22 Idaho 605, 127 P. 676; *Whalon* v. *North Platte, etc., Co.*, 11 Wyo. 313, 71 P. 995; *Nielson* v. *Parker*, 19 Idaho 727, 115 P. 488; *Idaho Power & Tr. Co.* v. *Stephenson*, 16 Idaho 418, 101 P. 821. The trial court in this case relied upon those decisions in concluding that respondent Hooppiania had, by actually diverting the waters of the springs and applying the same to a beneficial use, acquired a right that could not be disturbed by any one filing an application in the state engineer's office subsequent to the date of the actual appropriation, provided Hooppiania proceeded within a reasonable time to perfect his appropriation by making an application to the state engineer.

"The same rule or practice that existed in Utah relative to the appropriation of any of the public waters of the state prior to legislative enactment prevailed in our sister states of Idaho and Wyoming. In the absence of legislation, that method of acquiring water rights still prevails in the arid states. The language of the statutes of Idaho and Wyoming does not expressly or by necessary implication abolish the old recognized means of appropriating water. The language of the Utah statute is that 'rights to the use of the unappropriated public water in the state may be acquired by appropriation, in the manner hereinafter provided, and not otherwise.' Laws 1919, c. 67, § 41. If our statute did not contain the words 'and not otherwise,' then the decisions of the appellate courts of Idaho and Wyoming ought to and would have much weight in a determination of the question now under consideration.

"It is a matter of common knowledge in this state that many controversies arose between claimants and much litigation resulted prior to our legislative act of 1903 respecting the dates of the appropriation by different claimants of the waters of the state. Very much of that litigation had to do exclusively with the dates of the appropriations. The rule or principle of law that he who was first in time was first in right had become permanently established in the jurisprudence of the state. The fact as to who was a prior appropriator was

in much, if not all, of the litigation a controverted question, and one which in many cases was most difficult to determine by reason of their being no public record of just when such appropriations were made. It is therefore not only reasonable and fair to conclude, but affords a strong argument to support the claim, that the language found in the act of 1903 was intended to mean and does mean that the only method to be recognized thereafter was the method therein prescribed.

"The method or mode prescribed by the statute in the state of Wyoming is found in Comp. Stat. Wyo. 1920, § 835; in Idaho, 2 Idaho Comp. Stat. 1920, § 5568.

"We are of the opinion, and so hold, that the Legislature of Utah, by the act of 1903, intended to limit the method of acquiring any rights to the unappropriated public waters of the state to the method or means prescribed in that act. The rights attempted to be acquired by respondent Hooppiania by actually diverting the water and applying the same to a beneficial use must therefore be held to be subject to the right of appellant who will acquire the first right by completing its appropriation initiated by its application filed in the state engineer's office on April 25, 1918." (Parenthetical statement ours.)

The arguments, the cases bearing upon the subject, rules of statutory construction, sought to be applied for and against the position taken by Mr. Chief Justice Gideon in the foregoing excerpt from his opinion are set forth in the concurring and dissenting opinions in the case.

Having seen that the procedure by application to the State Engineer has not been thought applicable to flowing wells and other operations for the development of underground sources of water supply, may it not be pertinent to inquire whether or not something has heretofore been overlooked or too much carrying power given to the words, *"and not otherwise"*. The sentence containing those words is the first sentence of section 41, Laws of Utah 1919, c. 67, and reads:

"*Rights* to the use of the *unappropriated* public water in the State may be acquired *by appropriation*, in the manner hereinafter provided, *and not otherwise*." (Italics ours.)

It is then provided that the *appropriation* must be for some useful and beneficial purpose and as between *appropriators*, the one first in time shall be first in right. Section 42 then provides that any person in order to acquire the *right* to the

use of any *unappropriated* public water shall before commencing construction work to acquire a *"right or appropriation"* make an application in writing to the state engineer.

It would serve no good purpose to analyze or repeat the arguments for and against the conclusion reached in the *Hooppiania Case.* Both sides were extensively and learnedly presented. The writer is persuaded that the dissenting arguments with others herein submitted should work a reversal of the prevailing opinion in that case. Should any one doubt that there are two arguable sides to the question it is suggested that the arguments and authorities cited in the *Hooppiania Case,* supra, be consulted and weighed as well as the additional analysis and arguments herein. The analysis of the statute when the *Hooppiania Case* was before the court seems to have overlooked a distinction, recognizing which, gives full force and effect to the words "and not otherwise," and at the same time avoids difficulties incident to the appropriation of subterranean waters and harmonizes and makes effective all the provisions of the statute for the purposes intended by the Legislature.

It will be noted the statute (section 41) says:

"Rights to the use of the unappropriated public water * * * may be acquired by appropriation, in the manner * * * provided, and not otherwise."

Whatever a "right" and a "use" as related to an "appropriation" of water is, it is at least certain that no legal right to use water comes into existence until the water has been applied to a beneficial use—until the use has been established in some manner recognized as legal by the law. Any right is merely inchoate, subject to fulfilling required conditions. So that whatever distinction exists between the "water right" as a legal proposition and the use of water as a physical act, it is manifest the use must come first. The physical act of beneficial use matures the right. The statute likewise seems to recognize a distinction quite comparable to the one just made between "priority" and "appropria-

tion." The sentence in section 41 under consideration and immediately following, reads: "The appropriation must be for some useful and beneficial purpose, and, as between appropriators, the one first in time shall be first in right." The appropriation, it will be recognized, is the result of physical acts of construction of diverting works and the application of the water diverted to a "useful and beneficial purpose." The "priority" is the time to which the appropriation is referred following the use. Under the present statute the priority date may be the date of filing the application in the state engineer's office or under circumstances it may be a very different date. The statute relating thereto will be referred to later.

The apparent purpose of the filing of the application is to give notice to the world of the intention of the applicant to appropriate unappropriated public water and subject the same to a private right and use. It is a declaration of intention, made to the public. Such declaration by the application vests no right in the applicant except to proceed. Any effect it may have as applied to the appropriation to follow is purely conditional upon the performance of the things required by the statute to make application of the water to beneficial use, which and when done as required, the date of priority may relate back to the date of filing the application; but the basis of, the measurement and limit of the appropriation is determined by the quantity actually shown to have been applied to a beneficial use. The priority part of the procedure—the filing of the application with the state engineer—supplies a fixed time element, conditioned upon the carrying out of the declared intention in order to make available the right to have the date of priority relate back to the date of filing the application.

Essential to the appropriation is that of use. An appropriation is the act of turning, setting aside, taking possession of, or applying to a particular use a definitely ascertained quantity of water to a particular and beneficial purpose.

That the priority of the appropriation is not determined by the priority of the date of filing the application in all cases is manifest from the provisions of the statute. A comparison of the provisions of the statute will reveal that an appropriation of water as a matter of procedure is different from and may be independent of the notice feature of the statute contained in the application filed with the State Engineer.

Let it first be noted that section 46, c. 100, Laws of Utah 1903, and the same section 46 of chapter 108 of the amended law of 1905, relating to priority was eliminated from the Laws of 1919. As provided by the Laws of 1903 and 1905, the priority date was fixed by number of the application and was therefore out of harmony with other provisions of the statute as to the determination of priority dates. The section referred to as having been omitted from the law of 1919 reads:

"The priority number of such appropriation shall be determined by the date of filing the written application in the State Engineer's office."

Assuming that an appropriation is made or completed when the water subject to appropriation is applied to a useful and beneficial purpose and not before, as seems to be clear from the stautes, then the function of the application is merely that of notice and in a proper case the determining factor of priority, and therefore, if such are its only functions and if notice as between parties concerned is otherwise shown and priority is otherwise fixed, there would seem to be no substantial reason for placing in jeopardy a right otherwise valid because of a failure to comply with that feature of statutory notice when notice is otherwise supplied.

Let us examine some of the statutory provisions: The sentence about which the discussion revolves is as follows (section 41, c. 67, Laws of Utah 1919):

"Rights to the use of the unappropriated public water in the State may be acquired BY APPROPRIATION, in the manner hereinafter provided, and not otherwise." (Capitals ours.)

The statute says, "The right to the use" of water is acquired "by appropriation." Nothing is said in that section about a notice or an application. Section 42 provides the procedure and who may make application to appropriate unappropriated public water, what the application is and what it shall contain, and declares, "In order hereafter to acquire the right to the use of any unappropriated public water," "of the proposed appropriation," or "proposed use," and in addition thereto lays down the prohibition that, "before commencing the construction, enlargement or extension of any ditch, canal, or other distributing works, or performing similar work *tending to acquire* the said right or *appropriation*" the applicant shall make an application in writing to the State Engineer. Such language is strong language. Keeping in mind, however, what an appropriation or use is as distinguished from an application and as distinguished from the procedure to establish a record date of intention for the purpose of fixing a date of priority of the proposed use and by filing of a notice, also keeping in mind that a part of that strong language is that before doing the "work tending to acquire the said right or appropriation," the distinction between what in contemplation of law is an appropriation and what is a legally required procedure for fixing a date of notice to the world as to when the appropriation will become effective if and when completed as between prior or subsequent claimants is emphasized. (Italics added.)

It is well to compare also the provisions of section 10, c. 67, Laws of Utah 1919. It is there said:

"Appropriators shall have priority among themselves according to the dates of their respective appropriations, so that each appropriator shall be entitled to receive the whole supply to which his certificate entitles him before any subsequent appropriator shall have any right," etc.

(The language is, "according to the dates of their respective appropriations," and not according to the dates of filing their application in the office of the state engineer.)

It may be argued that the word "certificate" in the foregoing quotation has reference to a certificate issued or to be issued by the state engineer and that no such certificate would or could be issued by the state engineer without there having been filed with him the initiatory application provided for by section 42.

That part of section 10 is referred to because of the use of the words "appropriators" and "appropriations," and not as to the function or effect of the certificate. It may be further noted particularly that, when all the work has been done in pursuance of an application filed and the water has been applied to a beneficial use, the state engineer's "certificate" of appropriation is merely prima facie evidence of the right to the water sought to be appropriated. Section 56, Laws of Utah 1919, c. 67. It is also proper to here observe that the first forty sections of chapter 67, supra, consist of general provisions and a procedure for determining the rights to the use of water as among appropriators by a procedure initiated by the state engineer, and that the certificate referred to in section 10, supra, refers to the certificate to be issued by the clerk of the court as provided by section 37 upon judgment having been rendered by the court. It is with the provisions of section 41 that the procedure in the state engineer's office for the acquiring of new rights to unappropriated public water begins, while the procedure in the earlier sections are for the determination of former appropriations when disputes as to quantities, use, or priorities may be involved; the procedure there provided is, however, not exclusive.

Statutory provisions following section 41 of chapter 67, supra, of necessity contemplate the filing of an application with the state engineer, and the sections following section 41 outline a definite procedure. The question, however, is: Is that procedure exclusive and therefore prohibitive as to

the acquiring of a right to the use of unappropriated public water in any other way?

It may not only be conceded, but it is clear and needs no argument to establish the position that if an applicant or proposed appropriator for a proposed use, being qualified, desires to secure and have the benefits of priority, and be protected during the period of construction, and have his completed appropriation as shown by his final proof and the state engineer's "certificate" make for him a prima facie case (section 56, c. 67, Laws of Utah 1919), and have the benefit of record notice and available proof of the things done and have his priority relate back to a time earlier than the actual date of applying the water to a beneficial use, he must comply with the statutes and file his application accordingly. In so far as acquiring a right to the use of water by the method or procedure of filing an application in the state engineer's office is concerned, for the purpose of fixing a priority date under that procedure, the procedure is exclusive, and whatever the "certificate" authorized by law to be issued by the state engineer stands for may be acquired in the manner by the statute provided, "and not otherwise." This is all we think the Legislature intended. The procedure provided for by way of the state engineer's office does not affect any vested rights. Assume that A had, subsequent to the passage of the statute of 1903, gone upon a stream or had driven a pipe into an artesian area, say in 1905, and had diverted, used, and had continued to have and use beneficially three second feet of water, and had thereby reclaimed the land and made it productive, and that it constituted his earnings and accumulations for more than twenty years without disturbance or question. To make the situation still more difficult, suppose that the three second feet was the sole, total, and only available supply. Then suppose B comes in in 1933 and files an application in the state engineer's office to appropriate the three second feet of water A has been using. A protests upon the ground there is no unappropriated public water. The engineer over-

rules or denies the protest and authorizes B to proceed. A appeals to the court. May a court of equity say that A having failed to follow the whole procedure outlined by the statute acquired no right, that he had made no valid appropriation, that the water was unappropriated public water, merely because of the record date of filing an application for priority purposes had been omitted, and that B was entitled to proceed and upon proof of application to a beneficial use that A's use or appropriation came thus abruptly to an end and the right to the use of the water became B's?

We think the statute will not bear such construction, nor do we think the Legislature intended that it should. The law in this western country has always been, and we think it now is, that the essentials of a valid appropriation of water consist of, first, an intent to appropriate and use, however manifested; second, an actual construction of diverting works, followed by an actual diversion of the water; and, third, the application of a definite quantity of the water to a useful and beneficial purpose. The purpose and effect of each step should be considered and given effect. Priority procedure has its purpose, diverting works their function, application to a beneficial use its effect. Failure to file an application jeopardizes priority or postpones it, as does failure to complete diverting works within the required or extended time. The failure to complete the works of diversion or to apply the water to a beneficial use within the statutory time limitations may have the effect of postponing the priority date as effectively as though no application had been filed.

In the case of *Patterson* v. *Ryan,* 37 Utah 410, 108 P. 1118, 1119, decided in 1910, there is a statement clearly indicating the position of this court at that time. It is not necessary to state the facts. The statement, while making no reference to it, clearly relates to the statute of 1897, providing for the posting of notices before proceeding with construction works and diversion of water. The right referred to was initiated in 1901, two years before the passage of the law containing

the limiting phrase, "and not otherwise." In the course of the opinion Mr. Justice Frick said:

"The right to the use of water in this state has always depended upon whether the person claiming the water applied it to a beneficial use, and the notice and record required by the statute was merely prima facie evidence of the facts recited therein, namely, that he was applying the water to some beneficial use. Any person, however, who actually used the water for a useful or beneficial purpose, acquired the right to take the water so used as against all subsequent claimants, regardless of whether the user had posted notices or not." See, also, *Yates et al.* v. *Newton et al.*, 59 Utah 105, 202 P. 208.

The only other case decided in this jurisdiction relating to the question is the case of *Sowards* v. *Meagher*, 37 Utah 212, 108 P. 1112. This case is discussed by both Mr. Justice Thurman and Mr. Justice Straup in the Hooppiania Case.

We are therefore forced to the conclusion that the holding in the Hooppiania Case, in so far as it held that the actual diverting of the water and applying it to a beneficial use was inferior and gave an appropriator no right as against a right sought to be acquired based upon an application filed in the state engineer's office subsequent to the application of the water to a beneficial use by an actual appropriation and user, was erroneous and to that extent the case of *Deseret Live Stock Co.* v. *Hooppiania,* 66 Utah 25, 239 P. 479, is overruled.

The Supreme Court of New Mexico (*Yeo* v. *Tweedly,* 34 N. M. 611, 286 P. 970, 977) has recently declared squarely that artesian waters in that state are subject to appropriation, but as to the matter of procedure that court indicates that,

"As to artesian waters there was a special act regulating their use and requiring application to the state engineer for a permit before a well could be constructed or repaired."

We have no such provision in our law unless the provisions of section 41, c. 67, Laws of Utah 1919, are construed to require one desiring to drive an artesian well to obtain artesian or underground waters to apply to the state engineer. Shall

the construction of that section be adhered to as laid down in the case of *Deseret Live Stock Co.* v. *Hooppiania,* supra? The section reads:

"Rights to the use of the unappropriated public water in the State may be acquired by appropriation, in the manner hereinafter provided, and not otherwise. The appropriation must be for some useful and beneficial purpose, and, as between appropriators, the one first in time shall be first in right."

We have heretofore indicated that the present statute prescribing a procedure (not that a satisfactory procedure could not be provided or that it would not be advisable to provide such) has not, for the reasons stated, lent itself to the acquirement of the use of underground waters of the subterranean type, especially artesian areas as commonly understood, by application to the office of the state engineer. In the instant case we are not necessarily concerned with that question, as plaintiff alleges an established use before the passage of the law prescribing a procedure, and at a time when a vested right to the use of water by diversion and use from a natural source of supply constituted a recognized appropriation.

A recent Idaho case, *Hinton* v. *Little,* 50 Idaho 371, 296 P. 582, is analogous to the instant case, and we take the liberty of stating the substantive facts and the conclusion of the Idaho Supreme Court:

"The territory in question is underlaid at a depth of from two to three hundred feet, and beneath an impervious stratum, by subterranean waters confined horizontally between this upper impervious stratum and lower stratum, of such a nature as to force this subterranean water when artificial openings are made in the upper stratum to, and in some instances above, the surface of the ground. Laterally the subterranean waters are evidently continuous and permeate throughout the basin, * * * that the flow of all the wells are more or less interdependent and are affected by the increased or diminished flow of each well. * * * That the water entered this subterranean basin from high mountains lying to the south of the basin. Evidently there is thus some movement of this water at least into the basin from the south and laterally beneath the ground and between the different wells."

One of the parties contended that the same rule should be applied to the appropriation of subterranean waters as is applied to surface waters—"first in time, first in right." The other parties contended for the common law doctrine. Citing and relying upon the case of *Bower* v. *Moorman,* 27 Idaho 162, 147 P. 496, Ann. Cas. 1917C, 99, and distinguishing the case of *Public Utilities Commission* v. *Natatorium Co.,* 36 Idaho 287, 211 P. 533, the court held substantially as reflected by the syllabus:

"Subterranean waters, permeating horizontally throughout basin, and reaching surface through artificial openings in impervious stratum, *held* subject of appropration, and rule first in time is first in right applied."

In a recent case, *Maricopa County, etc., Conservation Dist. No. 1* v. *Southwest Cotton Co.,* 39 Ariz. 65, 4 P. (2d) 369, 374, the Supreme Court of Arizona, basing its decision upon an interpretation of the statutes of that state, and holding that the doctrines applicable in Arizona "merely involve an interpretation of the language of our statutes," and "for this reason many of the decisions from other states  *  *  * are not in point," held that the water intended to be made subject to the law of appropriation applied anly to surface rivers, lakes, and ponds, natural streams, or channels, and waters flowing in definite underground channels, springs, and lakes, and left percolating subterranean waters untouched by statute and therefore subject to the rules of the common law and not subject to appropriation. The case contains an exhaustive and scholarly discussion of the Arizona law and the fundamental principles there recognized as controlling, but is of no value to us as an authority because of differences in statutory provisions, and recognized principles applicable to the appropriation of water, not common to the two jurisdictions.

In this state the recognition of vested rights to the use of water has repeatedly been made. Laws of Utah 1880, c. 20,

§ 6; Laws of Utah 1888, § 422; Const. of Utah, art. 17, § 1; Laws of Utah 1897, c. 52, § 5; Laws of Utah 1903, c. 100, § 47; Laws of Utah 1919, c. 67, § 1; *Yates* v. *Newton,* 59 Utah 105, 202 P. 208, and cases cited.

In the case of *Peterson* v. *Lund,* 57 Utah 162, 193 P. 1087, 1090, the plaintiffs had used the water from certain springs arising upon their lands for more than thirty years. Defendant drove a well on adjoining lands. The flow from plaintiffs' springs was decreased. Tests and measurements were made. The trial court found as a fact that the springs and the driven wells were both supplied from the same "artesian water basin." Being of the opinion the tests and measurements were carelessly and improperly taken, this court reversed the decision of the trial court, and in remanding the case, among other things, said:

"In view of the importance of the subject, all of the Legislatures, as well as all of the courts within the arid zones of this country, have not only recognized the right of appropriating the waters flowing from springs, but that right has been established and fixed beyond question. Congress has also fully established and protected the right. It is also well settled that in acquiring the right to the use of water flowing from springs the source of the water is not controlling. That proposition has frequently been decided by the courts. In *Le Quime* v. *Chambers,* 15 Idaho 409, 98 P. 418, 21 L. R. A. (N. S.) 76, it is expressly held that it is not important 'whether the waters are from a well-defined subterranean stream or purely seepage or percolating waters.' It was accordingly held in that case that where the waters appear on the surface in the form of springs, such springs are subject of appropriation precisely as any waters from any stream or water course would be. In *Brosnan* v. *Harris,* 39 Or. 148, 65 P. 867 [87 Am. St. Rep. 649, 54 L. R. A. 628], the law is stated thus:

" 'There is no difference in the right of appropriation between springs and running streams, and the prior appropriator of the water of a spring will be as much protected as the appropriator of the waters of a stream.'

"In *McClellan* v. *Hurdle,* 3 Colo. App. 430, 33 P. 280, the law respecting the right of appropriation is very aptly stated in the following words:

" 'It is probably safe to say that it is matter of no moment whether water reaches a certain point by percolation through the soil, by a subterranean channel, or by an obvious surface channel. If by any

of these natural methods it reaches the point, and is there appropriated in accordance with law, the appropriator has a property in it which cannot be divested by the wrongful diversion by another, nor can there be any substantial diminution. To hold otherwise would be to concede to superior owners of land the right to all sources of supply that go to create a stream, regardless of the rights of those who previously acquired the right to the use of the water from the stream below.'

"Our decisions are practically to the same effect. See *Sullivan* v. *Mining Co.,* 11 Utah 438, 40 P. 709, 30 L. R. A. 186, and *Patterson* v. *Ryan,* 37 Utah 410, 108 P. 1118. In discussing the rule announced in the decisions of the foregoing cases it must be assumed that there was a legal appropriation. With respect to what constitutes a sufficient appropriation of water under the law in this jurisdiction, we refer to the case of *Sowards* v. *Meagher,* 37 Utah 212, 108 P. 1112, and the cases there cited. If, therefore, the plaintiffs have appropriated the waters of the springs in question, and have used the same for a beneficial purpose, as those terms are commonly understood and applied, then plaintiffs would have acquired a right to the use of the waters flowing from the springs which could not be interfered with without their consent. Under such circumstances the rights of the plaintiffs in the use of the waters flowing from the springs would be protected in a court of equity, and any interference therewith would be enjoined."

There the fact is found that the water for both the springs and the wells is supplied from the same artesian underground supply. The owner of the land discovered and appropriated the springs supplied from the same common source that the later artesian wells tapped. If there is a reasonable distinction between appropriating the water of a spring and driving a pipe into the ground and producing a spring, we fail at this time to appreciate it. To illustrate: Had plaintiff's predecessor driven a well in, say 1890, and it had flowed regularly and later he had decided to pull the pipe and in doing so it parted underground, and the water thereof continued to flow to the surface, to all not familiar with the history the flow would be called a spring when memory of the well and its history are forgotten. What was a well is a spring. Appropriation of either well or spring should be protected if appropriation and application to a beneficial

use have been made and maintained, as against a subsequent appropriator who diminishes or withdraws water necessarily and beneficially applied by the prior appropriator.

Respondent in his supplemental brief cites the case of *Petersen* v. *Cache County Drainage Dist.*, 77 Utah 256, 294 P. 289, 291, and argues that it cannot in principle be distinguished from the case at bar. In the Cache County Drainage Case, the defendant in improving the lands in the drainage district, lowered the surface water table in plaintiff's ground in such a way as to interfere with what was claimed to be his method of irrigation by the use of subirrigation. The court held that neither the doctrine of correlative rights nor that of reasonable use of percolating waters could be extended so as to prevent an adjoining landowner from improving his own lands by drainage, even though by draining his own land he thereby lowered the water table of adjoining lands, in the absence of negligence or malice. By way of dictum it is said:

"Assuming, however, that the percolating water which found its way into plaintiff's premises before the drainage canal was constructed came from natural sources, still the defendant is not liable, in the absence of malice or negligence."

While some analogies may be drawn from the *Petersen* v. *Cache County Drainage District Case,* supra, and the instant case, it is clearly distinguishable. As said in the case, neither the doctrine of correlative rights nor reasonable use should be extended to such a case, and the doctrine of appropriation was not suggested nor would it be applicable unless plaintiff's source of supply were a natural source and had been appropriated and used beneficially. The situation is the reverse of an appropriation and is quite analogous to the doctrine of the case of *Acton* v. *Blundell,* supra. On the part of defendant, it is getting rid of water detrimental to the land, so the doctrine of beneficial use by way of appropriation or otherwise seems inapplicable. Had the source been a natural source, as distinguished from an artificial source arising out

of a method of irrigation and the plaintiff had appropriated the water from such source and applied it, it would still be a question of application and use and not one of drainage. Had the purpose been the development of water by drainage to be appropriated and applied to irrigation purposes, still the water would not be subject to appropriation, its source being from the irrigation of plaintiff's lands, and, had the source been natural and plaintiff had not made an appropriation and application to a beneficial use, it would have been subject to appropriation, no intervening or prior right thereto having become vested.

It may be suggested that, applying the doctrine of appropriation and beneficial use to underground percolating waters, we are submitting to a rule where uncertainties prevail and the interference, if at all, with the right of a prior appropriator becomes one of degree, and that the distinction between flowing underground waters and those that are not flowing and hence a part of the soil is difficult, or impossible accurately, to determine. This may be so. The question, however, is usually one of proof, and the matter is not to be determined by the niceties of diffusion or capillary attraction or imperceptible streams because of the diminutive size thereof, but is to be determined upon the principle and at the place where the water is applied or diverted. Ordinarily no one questions an interference with his water right until the flow has been perceptibly or appreciably diminished. The degree or quantity, first, of the appropriator, and, second, the degree or quantity abstracted, withdrawn or cut off from the appropriator, present the questions for determination.

We are of the opinion the complaint in the instant case states a cause of action in equity. The trial court was, therefore, in error in sustaining the general demurrer to the complaint. We think the case must be remanded to the trial court for further proceedings. The trial court is therefore directed to reinstate the case, overrule the general demurrer, and proceed in harmony with the views

herein expressed; appellant to recover costs. Such is the order.

EPHRAIM HANSON, J., concurs.

STRAUP, Chief Justice (concurring).

I concur. I, too, think the complaint states a cause of action. In addition to other allegations, it is alleged that, underneath the surface of lands of the plaintiff, of the defendants and of divers others, there is an artesian basin consisting of an area 10 square miles, fed or created by waters flowing or percolating from mountains nearby; that thirty-five years prior to the filing of the complaint the plaintiff drilled a two-inch pipe into the basin approximately 350 feet below the surface and tapped the waters underneath, which when so tapped by natural and normal pressure flowed through the pipe to the surface and continued to so flow, until the grievances alleged in the complaint, which waters during the whole of such period were openly and under claim of right beneficially applied and used by the plaintiff for irrigation, domestic and culinary purposes and for watering live stock; that such waters constituted the plaintiff's only source of water, and that, as alleged, when he was deprived of the use thereof by the alleged wrongful acts of the defendants he was without water; that the lands of the defendants adjoined the lands of the plaintiff; that in 1927 and 1928 the defendants on their lands drilled or drove two four-inch pipes or wells into the artesian basin and thereby obtained a flow of 80 gallons a minute, and in 1929 they installed and operated an electric pump attached to one of the wells or pipes by means of which they obtained a flow of 180 gallons per minute, which, as alleged, stopped the flow of water from plaintiff's pipe or well; that, to insure the plaintiff the quantity of water to which he is entitled, it is necessary that a constant pressure be maintained sufficient to force the waters to the surface; that the opening of large wells and pumping water from the basin, such as operated by the defendants, withdrew an excessive quantity of water

therefrom and reduced the pressure to such an extent as to lower the static head and thereby prevented the water from reaching the surface through plaintiff's pipe or well and in effect dried it up; that the employment and operation of the pump by the defendants withdrew water belonging to the plaintiff and destroyed his share of the waters of the basin; that, according to the surface area of the lands of the defendants, they were not entitled to waters of the basin in excess of 25 gallons per minute, and, if only such quantity be withdrawn by them, the supply of water in the basin would be sufficient to maintain a pressure to insure the plaintiff and others similarly situated of their just proportion of the waters of the basin, but, if the defendants are permitted to withdraw the quantity of water withdrawn by them, they will thereby withdraw not only waters "normally subjacent" to their own premises, but also "normally subjacent" to the premises of the plaintiff thereby taking water belonging to him.

This, if the so-called doctrine of correlative rights be applied, that each landowner underneath the surface of his land equally with others similarly situated is entitled to waters of the basin in proportion to the surface area of his land, and if the waters of the basin are insufficient to supply to all the quantity of water they on such basis equally are entitled to, each to share ratably in proportion to the quantity of water to which each is entitled in accordance with his surface area, the complaint, as I think, states a cause of action.

On the other hand, I think sufficient facts also are alleged to state a cause of action on the theory or doctrine of an appropriation of waters. Considered from such viewpoint, the characterized and described artesian basin, as alleged in the complaint, the underground waters are more than mere percolating or diffused waters, but constitute a subterranean body or basin of water in character more or less wild, and thus public waters subject to be claimed and ac-

quired by appropriation. That the subterranean basin is or may be fed or may be created by waters flowing, percolating, or seeping from mountains does not change the character of the basin any more than a surface lake or other body of water or stream, which has its source from waters flowing or percolating from mountains. In other words, had waters from the artesian basin by natural and normal pressure, without artificial means, risen to the surface on plaintiff's lands in the nature of a spring, though in amount or quantity far in excess of any proportional amount or quantity based on surface area of lands underneath which the artesian basin exists, yet, if the plaintiff under claim of right for thirty-five years had openly diverted such waters and made a beneficial use thereof, his prior right to the use of them under the doctrine of appropriation could not well be questioned. That he by artificial means drilled a pipe and tapped the waters of the artesian basin and thereby brought them to the surface by natural and normal pressure, and, as here, for thirty-five year, under claim of right, openly diverted and beneficially used such waters, he, in principle, as it seems to me, equally acquired a prior right to all such waters so diverted and beneficially used by him, which may not be disturbed or interfered with or diminished by any subsequent claimant to the extent of depriving or preventing him of the use of such waters so acquired and enjoyed, at least not without restoring or otherwise furnishing him at the orifice of his well at the expense of such claimant, waters from the basin in quantity and quality as theretofore diverted and used by him from his well.

Under the statute, R. S. 1933, 100-1-1, I regard the waters of the artesian basin as described in the complaint, as subterranean body or basin of water, in character more than mere diffused waters mingled and diffused with soil, rock, gravel, or earth below and as such a part thereof belonging to him who owns the land in which such waters are found. There is some confusion in the adjudicated cases and texts as to the meaning of the term "percolating waters," or at least

in the sense in which such term is used by them. I use the term as diffused waters in lands privately owned, percolating or seeping through the ground, moving by gravity in any or every direction along a line of least resistance, not forming any part of a stream or other body of water either surface or subterranean, and, as far as known, not contributing or tributary to a flow of any defined stream or body of water. In other words, mere diffused waters in privately owned lands, not flowing in any defined or known stream, either surface or subterranean, or not forming a part of a body of water either surface or subterranean, belong to the owner of the soil or land and may be used and disposed of by him as he sees fit, so long as such waters are on or in his lands; if, however, such waters percolate or seep from his land on or in and are diffused with lands of another, such waters are lost to the former and he may not pursue or reclaim them on or in any lands of such other; nor in such case may such other acquire or claim any right or interest in diffused waters on or in lands of the former, so long as they are on or in his lands. Such waters so on or in lands privately owned may not, by appropriation or otherwise, be acquired by anothers, except by grant. To hold otherwise necessitates, as I think, the overruling of a number of prior decisions of this jurisdiction. Such waters are not "public waters" as defined by our statute, and hence are not subject to appropriation by another. On the other hand, waters flowing in a known or defined stream, either surface or subterranean, or in or forming a part of a body of water either surface or subterranean, are by the statute, when considered in all its parts, characterized as "public waters," and thus subject to appropriation; and he who first appropriates waters therefrom and makes a beneficial use thereof acquires a prior right thereto as against all subsequent appropriators or claimants. Giving our statute and all its parts full effect, I do not see how any other conclusion may well be reached. By following the statute, I think controversies relating to water rights and irrigation are more readily determined than by wander-

ing from the statute and following theories inapplicable to or in derogation of it.

In reaching such conclusion I do not repudiate the doctrine of correlative rights as applied in the Horne Case referred to in the several opinions filed herein. The doctrine has its application chiefly to underground, diffused or percolating waters. As I have indicated, such waters in privately owned lands belong to the owner of the soil. They are a part of it. In the Horne Case, as I understand, the waters were treated and regarded as percolating waters. In such case each landowner is entitled to have what percolating waters whether on the surface or below are in his lands; they are a part of his soil or ground. In taking what so belongs to him, he may not take what belongs to another. Where percolating waters are beneath the surface, it, let it be assumed, is difficult to determine the quantity to which each is entitled. Thus, in applying the doctrine of correlative rights, the measure thought most suitable is in accordance with the surface area of each landowner, bottomed on the maxim, "to so use your own as not to injure another's property"; that is, in taking what waters one claims to be his, he must not take what belongs to another or in diminution of his equal rights. Or, as put by respondent's counsel,

"neither one nor more than one can withdraw water in such quantities as will lower the general level to a point from which the general supply is not readily, easily, and economically available."

Though in the Horne Case the claimants were somewhat numerous, yet the surface area involved was not extensive. It was rather limited and restricted. The waters there being regarded as percolating waters, diffused waters, and the surface area confined and limited to a small area as it there was, let it be conceded that in such a situation, the doctrine of correlative rights could well be applied as it was in the Horne Case. And the more confined and restricted the surface area of those claiming and having equal rights to percolating waters in their lands underneath the surface, the more appli-

cable is the doctrine of correlative rights, allotting to each a quantity of water in accordance with his surface area of land.

But, as alleged in the complaint, we, as I think, have here a different situation, one where the doctrine of correlative rights is inapplicable. The doctrine is not applicable to all underground waters. That is apparent. It as I have stated is applicable only to percolating waters, diffused waters in lands underneath the surface. Here by the complaint the waters are not characterized as mere percolating waters, but as a great basin of subterranean waters underlying or existing substantially under a valley of cultivable lands for many miles, 10 square miles, in effect as described, a particular series of strata deposits over an extensive crustal depression, and, unless subsequently disturbed, dipping toward its center. To waters so collected and confined in the depression, moving forward in a body through lines of least resistance, or held in the depression as a body or basin of water, similar to a lake or body of water on the surface, the doctrine of correlative rights, measured on the basis of surface areas of owners of land, is, in my judgment, inapplicable and impracticable. I cannot regard all subterranean waters as percolating waters and then apply the doctrine of correlative rights to them.

To call all subterranean waters percolating waters, unless shown to flow between banks or in a natural defined channel, is a misnomer. The case here went off on a demurrer to the complaint. We must take it as we find it. So taking it, I regard the underground waters as therein characterized, not as percolating waters, but as a basin of water moving or held or confined in the depression, and thus public waters subject to appropriation. What, on the trial, the evidence in such respect may show is another matter. I am not now concerned with that, except to say that, if the case be established as alleged, the doctrine of appropriation and not of correlative rights should be applied.

ELIAS HANSEN, Justice (concurring in results).

It is not clear what theory the pleader had in mind when he drew the complaint in this cause as to the basis of plaintiff's claimed right to the use of the water in controversy. Some of the allegations of the complaint are such as are usually found in pleadings wherein the pleader's claim to the use of the water is founded upon prior appropriation. Other allegations clearly indicate that plaintiff seeks to establish his right to the use of the water in question upon the doctrine of correlative rights as announced by this court in the case of *Horne* v. *Utah Oil Refining Co.*, 59 Utah 279, 202 P. 815, 31 A. L. R. 833. Still other allegations seem to proceed upon the theory that plaintiff claimed his right to the use of the water in dispute by reason of his "exclusive, hostile, adverse, open, and notorious" use thereof "under claim of right" for a period of more than thirty-five years. In our discussion and determination of the questions here presented for review we should avoid confusing the law applicable to the acquisition of a right to the use of the water by appropriation, by the doctrine of correlative rights, and by adverse use. It will aid in the clarity of our discussion and the soundness of our conclusions if the complaint be viewed in the light of, and the sufficiency of its allegations to state a cause of action be tested by, the law applicable to the acquisition of a water right in each of the three manners indicated. The prevailing opinion, as I understand it, holds that sufficient facts are alleged in the complaint to establish, if sustained by proof, that plaintiff has acquired a right to the use of the water in question by appropriation. With such view I am unable to agree. A right to the use of public water of this state may be acquired by appropriation as by law provided. However, a compliance with the law applicable to the appropriation of public water does not aid one in establishing a right to the use of water which is privately owned. It is, and for many years has been, the settled law of this jurisdiction that water flowing in defined natural channels either above

or below the surface of the earth is public water and as such may be appropriated subject to all existing rights to the use thereof. R. S. Utah 1933, 100-1-1. It has also been held that the water in a large lake, such as Utah Lake, is public water and as such subject to appropriation. *Salt Lake City* v. *Gardner*, 39 Utah 30, 114 P. 147. That water of a lake is subject to appropriation was expressly provided for by Comp. Laws Utah 1888, § 2780. So also has it been held that water on the public domain is public water and subject to appropriation without regard to whether such water is percolating in the land or flowing through the land in a subterranean stream. *Peterson* v. *Wood*, 71 Utah 77, 262 P. 828. On the other hand, percolating water in privately owned land is not public water and hence not subject to appropriation. *Willow Creek Irrigation Co.* v. *Michaelson*, 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687. The same rule applies to a spring on privately owned land where the water therefrom does not flow off such land. *Deseret Live Stock Co.* v. *Hooppiania*, 66 Utah 25, 239 P. 479. The case of *Horne* v. *Utah Oil Refining Co.*, supra, is authority for the doctrine that water of an artesian basin within or subjacent to privately owned lands is not public water, but belongs to the landowner, and therefore such water is not subject to appropriation. It would seem that water of an artesian basin subjacent to land of the public domain is public water and may be appropriated so long as the land remains a part of the public domain. Kinney on Irr. & Water Rights (2d Ed.) vol. 2, § 1177, p. 2139. In my opinion the law as announced in the Horne Case should not be disturbed. That case was decided October 8, 1921, and a rehearing denied October 28, 1921. It is reasonable to assume that since the Horne Case was decided those who are interested in underground water have relied upon the doctrine announced in that case as the settled law in this jurisdiction. It may well be that water rights have been adjusted and that money and labors have been expended in reliance upon the law as so announced by this court. To repudiate the doctrine of that case, at this late date, may well result in

very grave injustice to many who have relied upon its pronouncements. Only the most cogent reasons can justify the overruling of that case. The doctrine of correlative rights is not new and is not peculiar to this jurisdiction. It has the approval of numerous courts of last resort and eminent authors as will be seen from an examination of the authorities cited in the Horne Case. It is founded upon sound principles of law. As the term implies, public waters are such as belong to the public. By complying with the law with respect to the appropriation of public water the right to the use thereof may pass into private ownership. If water in an artesian basin subjacent to privately owned lands be held to be public and as such subject to appropriation, it necessarily follows that such water may be appropriated by any one possessed of the qualifications necessary to become an appropriator. To hold that water from a given source is public and subject to appropriation implies that there is available to a prospective appropriator some lawful procedure whereby he may acquire the use thereof. If it be held that water in an artesian basin subjacent to privately owned lands is public water and subject to appropriation, such holding would be barren of any practical results in the absence of a provision for some lawful means whereby a would-be appropriator may acquire possession of the water and apply it to a beneficial purpose. To illustrate: A and B own in severalty two tracts of land within which is an artesian basin, no part of the water of which is being used, so C, knowing such to be the facts, attempts to make a lawful appropriation thereof. In such case the mere fact that the water in the artesian basin within the lands of A and B is declared to be public water would be of no avail to C in the absence of a provision whereby C may lawfully acquire possession of such water and apply it to his proposed use. If the water of an artesian basin subjacent to privately owned land is to be given all of the characteristics incident to public water, some provision must be made whereby it may be appropriated. The lawmaking power of this state has not seen fit to extend to a prospective

water appropriator the right, by condemnation or otherwise, to go upon the land of another and there prospect for or appropriate water of an artesian basin. It is open to very serious doubt if the Legislature has any such power. I am thus of the opinion that under the authorities and upon principle the law as announced in the Horne Case should not be disturbed. Upon the authority of that case the allegations of the complaint are insufficient to establish a right in plaintiff to the use of the water in question on the theory that he has acquired such right under the law of appropriation.

Little need be said with respect to those portions of the complaint which seem to indicate that plaintiff relied upon adverse use as a source of his claimed right. While it is alleged that plaintiff's use of the water in question was exclusive, hostile, open, adverse, notorious, and under claim of right, other allegations of the complaint are merely to the effect that some thirty-five years prior to the acts complained of plaintiff's predecessor drove a well from which he secured a flow of water, which water has, since acquired, been continuously put to a beneficial use by plaintiff and his predecessor in interest. Plaintiff's use of the water flowing from his wells has not been, so far as appears from the allegations of the complaint, in any sense adverse to any rights which the defendants have had to such water. Had defendants, prior to the time they began using the water in question, brought an action against the plaintiff, they would not, so far as appears from the allegations of the complaint, be entitled to any legal or equitable relief. The complaint is fatally defective on the theory that plaintiff has acquired title to the water in question by adverse use.

Viewing the allegations of the complaint in the light of the doctrine of correlative rights, a more serious question is presented. Under the doctrine of correlative rights, water in an artesian basin subjacent to privately owned land belongs to the landowners. It appears from the allegations of the complaint that the artesian basin here involved is subjacent to privately owned land. In a limited sense the landowners are

tenants in common of the water within their lands. Water is constantly seeking its own level, and hence it follows that, if one landowner draws off an unlimited quantity of the water from his own land, he thereby takes not only the water from his own land, but also draws water from the land of his neighbor. The doctrine of correlative rights is calculated to conserve the water within an artesian basin and to permit each landowner to use his proportion of the common supply provided he makes beneficial use thereof. Under the rule announced in the Horne Case, if the common supply of water in an artesian basin is barely sufficient or less than sufficient to supply all, each landowner should be limited to his just proportion according to his surface area. Doubtless the rule thus announced in the Horne Case will, in many instances, be difficult of application. From the very nature of underground waters it is difficult to formulate any rule which will be easy of application and at the same time do justice between interested parties.

It is earnestly urged on behalf of defendants that the complaint is fatally wanting in facts to state a cause of action under the law of correlative rights. I quite agree with the able argument made on behalf of defendants that the mere fact that the pressure in plaintiff's well has been reduced or that the water of such well has ceased to flow, as it was wont to do, does not necessarily entitle plaintiff to the relief prayed or to any relief. Correlative rights of landowners in and to the water of a subjacent artesian basin may well be of no practical value to some of the landowners unless such rights are coupled with correlative rights to the means whereby the water may be drawn from the basin. To illustrate: It may be made to appear that plaintiff's wells are located on lands higher in elevation than those of the defendants, and also that, if defendants draw from the basin their just proportion of the water thereof, the pressure of plaintiff's wells will be reduced or cease to flow out of the pipe above the ground. Such a state of facts is the rule rather than the exception where artesian basins are involved. If, under such

a state of facts, it be held defendants may be enjoined from taking their just proportion of the water from the artesian basin, obviously, for all practical purposes, they will be denied their correlative rights in and to the water of the basin. As a corollary to the doctrine of correlative rights to the use of the corpus of the water of an artesian basin, there must be evolved a doctrine as to the manner or means whereby such correlative rights to the water may be exercised. Doubtless it will be difficult, if not impossible, to lay down any hard and fast rules with respect to what means may or may not be employed by a landowner to secure his just proportion of the water of an artesian basin, as each case will probably stand in great part upon the facts of the particular case. In the absence of all the facts in this case, it would be ill-advised for us to at this time say what means the defendants may or may not employ to secure their proportion of the water from the artesian basin in question.

In my opinion, if the complaint merely alleged that, because of the acts complained of the pressure in plaintiff's wells was reduced and the water ceased to flow above the surface of the ground, the complaint would be fatally defective because of want of sufficient facts. It is, however, in substance alleged in the complaint that by reason of the acts complained of the defendants have withdrawn and are withdrawing from the artesian basin, water in excess of the supply thereof; that plaintiff is wholly deprived of the use of the water from his wells, and that the same has been destroyed; that defendants have withdrawn and are withdrawing from the artesian basin more than their share of the water thereof; that, if the defendants be permitted to continue to pump from the basin the quantities that they have been pumping, the supply of the basin will become exhausted. These allegations are statements of ultimate facts, and, if sustained by proofs, entitle plaintiff to relief under the doctrine of correlative rights.

I thus concur in the order made in the opinion of Mr. Justice MOFFAT.

FOLLAND, Justice (concurring in the results).

Because of the importance of the questions discussed by Mr. Justice MOFFAT in the prevailing opinion, I feel justified in adding my views to those already expressed by Mr. Justice ELIAS HANSEN, with whom I am in agreement. I, too, concur in the order made by Mr. Justice MOFFAT, but for the reasons and on the grounds stated by Mr. Justice ELIAS HANSEN. The issue disclosed in the prevailing opinion is whether underground percolating waters, including waters of artesian basins, are public waters and hence subject to the same regulation and control by the state under existing or future law, and subject to appropriation by persons desiring to put them to a beneficial use, as are applicable to surface streams and other public waters, or whether such waters are to be regarded as privately owned or the community property of the owners of the land in and through which they percolate, and hence subject to the so-called "correlative rights" or "American" doctrine. The matter is of the utmost importance to the preservation of vested property rights and to the future development of the state.

This case, and the two other cases now before the court and about to be decided, were argued and presented on the theory that the rule of correlative rights as announced in the case of *Horne* v. *Utah Oil Refining Co.*, 59 Utah 279, 202 P. 815, 31 A. L. R. 883, was the settled law of this state applicable to underground percolating waters. These cases were not argued on the theory that the law of exclusive rights (the law of appropriation) was applicable to percolating water, and as to that we have not had the benefit of the views of counsel either in support or opposition or in contemplation that the court might decide the cases, or either of them, on that theory.

If percolating waters, including artesian waters, are to be regarded as publicly owned and subject to the rule of "first in time, first in right," this is the first time such doctrine has been announced in this court, and the law in this respect

should be settled only after litigants and others interested are afforded the fullest opportunity of presenting their views to the court.

As I read the decisions and the statutes, I believe it is settled law in this state: (1) That the only waters subject to appropriation are surface waters and such underground waters as flow in underground streams in known or defined channels, and that the appropriator of such waters acquires an interest in the stream or other supply from the point of diversion back to the original source, even to the percolations in the soil where the appropriations of the water were made while the lands were still part of the public domain. (2) That percolating waters, which include all underground waters except such as flow in known or defined channels underground, are a part of the soil and belong to the owner, subject to two exceptions, (a) if the percolating or subterranean waters in the soil may be the feeders or source of supply of a stream or water course, spring, or well, appropriated or put to a beneficial use when the land was public domain, it may not be taken by the owner of the freehold in diminution or depletion of the rights of the appropriator for sale or use away from the land where found, but may be used thereon and the owner may make a reasonable use on his land even though it may interfere with the rights of prior appropriators; (b) the right of the owner is a correlative right, that is, he may take and use the water obtained from his soil provided he does not deprive other landowners within the same subterranean basin or water belt of a similar right to take and use the waters within their lands for a beneficial use on such lands; and that no owner of such lands may extract such waters for use on distant lands or for purposes not connected with lands in the basin, if thereby he deprives any of the landowners of the district of their proper or proportionate share of the waters percolating in their lands.

Subterranean waters are by law divided into two classes: (1) Percolating waters; and (2) underground streams flowing in known or defined channels. 55 A. L. R. 1386. The

presumption is that subterranean water is percolating water rather than the water of a known and defined subterranean stream. The burden of proof is on one who alleges the waters are flowing in a known and defined stream to prove such fact. *Willow Creek Irr. Co.* v. *Michaelson,* 21 Utah 248, 60 P. 943, 944, 51 L. R. A. 280, 81 Am. St. Rep. 687. Other cases cited in 55 A. L. R. 1387. Water supplied by artesian wells is percolating water. *Horne* v. *Utah Oil Refining Co.,* supra.

It is settled in this state that all natural streams and other surface waters and streams flowing underground in known or defined channels are subject to the law of appropriation, and that springs, wells, and percolations arising in or on the public domain are subject to appropriation if the right be initiated before the lands are segregated from the public domain and the water applied to a beneficial use. *Sullivan* v. *Northern Spy Min. Co.,* 11 Utah 438, 40 P. 709, 30 L. R. A. 186; *Stookey* v. *Green,* 53 Utah 311, 178 P. 586; *Peterson* v. *Lund,* 57 Utah 162, 193 P. 1087.

The law with respect to subterranean waters is of comparative recent development. The first English case was decided in 1843, that of *Acton* v. *Blundell,* 12 Mees. & W. 324, 152 Eng. Reprint, 1223, 15 Morrison Min. Rep. 168, followed in 1859 by *Chasemore* v. *Richards,* 7 H. L. Cases 349, 11 Eng. Reprint 140, 1 Eng. Rul. Cases 729, decided by the House of Lords. These cases established what is known as and referred to in the books as the common-law or English rule that percolating waters are regarded as belonging to the owner of the freehold, and that such owner may, in the absence of malice, intercept and take such waters while they are on his premises and make whatever use of them he pleases either on the premises or elsewhere, regardless of whether he thereby cuts off the flow of such waters to adjoining lands or deprives adjoining landowners of their use. The rule is based on the maxim, *Cugus est colum ejus est usque ad coelum et ad inferos.* The rule has been followed by many of the states of the union, but never has been followed with-

out modification or change in the state of Utah, notwithstanding many of the text-writers and judges interpret the early decisions as having adopted the English rule. The Utah cases are bottomed on the common-law rule, but with certain modifications, as will be seen by an examination of the cases. In the earliest cases there was no necessity, under the facts, for any modification of the common-law rule because the rights of adjoining landowners who, under the American rule, might be entitled to correlative rights in percolating waters were not involved.

The earliest case involving percolating waters was *Sullivan* v. *Min. Co.*, supra, and here the court held one entitled to go under the public domain, dig a well, and appropriate the waters found therein to a beneficial use. The decision is based on the ground that the lands were public and under the practice in the territory and the laws of Congress a valid appropriation might be made of such waters as public waters. The next case is that of *Crescent Min. Co.* v. *Silver King Min. Co.*, 17 Utah 444, 54 P. 244, 245, 70 Am. St. Rep. 810. The court there said:

"The waters issuing from the artificial tunnel into the lake are found to be underground, percolating waters from the mining claim of the defendant, and not waters naturally flowing in a stream with a well-defined channel, banks, and course. Under such a state of facts, the law seems to be well settled that water percolating through the soil is not, and cannot be, distinguished from the soil itself. The owner of the soil is entitled to the waters percolating through it, and such water is not subject to appropriation. The ordinary rules of law applying to the appropriation of surface streams do not apply to percolating water and subterranean streams, with undefined and unknown courses and banks."

The court further said, construing the statute:

"We conclude that section 2780, Comp. Laws Utah 1888, was intended to apply to natural water courses having a natural source of supply, and that it does not apply to percolating waters arising in the land of the owner, and carried through artificial drains, constructed by the owner, for the purpose of improving the property, or for the convenience of the owner. So long as such water remained

in the tunnel, or on said mining claim of the defendant, it was not open to appropriation by the plaintiff, or any other person, except the defendant and his grantors, and was the property of said defendant, and subject to its ownership and control."

While this case has been explained and limited strictly to the facts thereof, I do not believe it has ever been overruled. There was no occasion for the court to speak of either of the modifications of the rule which appear in the later cases because the facts in the case do not require it. The appropriation of the plaintiff was not from a natural stream or from any artificial stream flowing from the Silver King property while it was yet a part of the public domain, nor did the defendants take waters which would have percolated underground into the lands of plaintiff, and which would have required an expression with respect to the correlative rights of adjoining landowners. If it were then the law that all of the subterranean waters of the state were public waters subject to the law of appropriation, the case probably should have been decided differently.

The next case involving percolating water was *Herriman Irrigation Co.* v. *Butterfield Min. & Mill. Co.*, 19 Utah 453, 57 P. 537, 541, 51 L. R. A. 930. The mining company constructed a tunnel into the watershed lands of the creek, the waters of the creek having been previously appropriated by plaintiff, and dried up the springs which were the source of supply. While the case was reversed and a new trial directed because of incomplete and erroneous findings of fact, the court said:

"We are clearly of the opinion that the defendant company did not acquire a right to any of the water flowing from said tunnels, except such as was developed by percolation, and that the plaintiff retains the right to all the water flowing in the natural channel of Butterfield creek, diminished only to the extent of the increase of the quantity of water which naturally flowed in the channel of Butterfield creek before said tunnels were run and said springs were dried up. This right of plaintiff is not affected because the underground channels of said springs are not traceable."

This language, while somewhat obscure yet indicates that the prior appropriators were entitled to all of the water which they had appropriated and which would flow naturally in the stream, but that the mining company was entitled to the excess over and above that amount which it had developed by the driving of its tunnel.

Much is said by Mr. Justice MOFFAT with respect to the meaning of the language in section 2780, Comp. Laws Utah 1888, "or other natural source of supply." This, he argues, refers to underground waters, and that the purport of the statute is to subject all waters, including subterranean waters, to the law of exclusive right as public waters. This court, however, has held otherwise in *Willow Creek Irr. Co.* v. *Michaelson,* supra. There the decisive question was whether or not the defendant by virtue of her patent to the land on which a bog or marsh was formed was the owner of the water flowing therefrom. Plaintiff contended this was a natural stream or a natural source of supply which under the statute, section 2780, supra, was subject to appropriation. The court held the waters were percolating waters on privately owned lands and were not subject to appropriation under the statute. It was there said:

"Undoubtedly, under this provision, any person or persons may divert and use the unappropriated water of any 'natural stream, water course, lake, or spring, or other natural source of supply,' for any of the purposes mentioned in the statute, but it is evident that the enactment, although comprehensive terms are employed therein in reference to the appropriation and use of water for the purposes of irrigation, must be construed to mean a 'natural stream, or other natural source of supply,' flowing or situated upon lands over which the sovereignty has dominion, or which forms a part of the public domain, and not to streams or springs or other waters arising through percolation upon land, after it has been segregated from the public domain, and the title thereto passed into private ownership. The statute, therefore, cannot be so interpreted as to include a stream flowing from a bog or marsh like the one in the case at bar, which did not make its appearance upon the surface until after the land had been purchased from the government by a private individual.

"When the United States issued its patent to the respondent, neither the bog nor marsh, nor the water in question, was visible upon the land conveyed. Nor was there any known and defined subterranean stream thereon. At that time the water, if it existed at all, was percolating through the soil, or flowing in a subterranean stream, having no defined or known channels, courses or banks. Water so percolating and flowing *forms a part of the realty, and belongs to the owner of the soil*. A conveyance or grant by the United States of any part of the public domain to a person, natural or artificial, carries with it the right of filtrating or percolating water, and to streams flowing through the soil beneath the surface, but in undefined and unknown channels, just the same as it carries with it the right to rocks and minerals in the ground which have not been reserved in the instrument of conveyance or by statute. Water, intermingling with the ground or flowing through it by filtration or percolation or by chemical attraction, is but a component part of the earth, and has no characteristic of ownership distinct from the land itself. In the eye of the law, water so commingled and flowing, or motionless, underneath the surface, is not the subject of ownership apart and distinct from the soil. If, however, subsurface streams of water flow in clearly defined channels, it is otherwise, for then the rules of law applicable to surface streams and waters apply."

*Herriman Irr. Co.* v. *Keel*, 25 Utah 96, 69 P. 719, was a second appeal of the same case as *Herriman Irr. Co.* v. *Butterfield Min. & Mill. Co.*, reported in 19 Utah 453, 57 P. 537, 51 L. R. A. 930. The decision turned mainly on questions of fact. The three judges wrote separate opinions and discussed the questions with which we are here concerned. It is difficult, if not impossible, to obtain a clear conception of any principle of law decided. The case settled no principle and is without much force as a precedent. The decision, however, gave the mining company a portion of the water developed by its tunnel on the theory that it was the owner thereof by reason of the ownership of the land. The fifth headnote is as follows:

"Water standing in land underneath the surface, or passing through it by filtration, percolation, chemical attraction, or in undefined and unknown streams, belongs to the land and the incidental drying up of springs caused by the escape of such waters into and out through a tunnel driven by one on his own land is damnum absque injuria."

In *Garns* v. *Rollins,* 41 Utah 260, 125 P. 867, 869, Ann. Cas. 1915C, 1159, the court recognized that

"in this jurisdiction the common-law doctrine as declared by the Supreme Court of California in the cases above mentioned, in so far as applicable to the questions litigated in which was involved the right of the owner of the land to the percolating water found therein, has been adhered to and followed,"

and then stated that the question of ownership of percolating subterranean water was not involved, since the seepage or percolating waters came from ordinary irrigation of appellant's land and is nothing more than surface or waste water. On these facts the owner of the land was held to be the owner of such water and entitled to put it to a beneficial use on that or any other land. The court expressly withheld a decision on whether the conditions in this state require a modification of the common-law doctrine as to percolating waters.

*Roberts* v. *Gribble,* 43 Utah 411, 134 P. 1014, was decided on authority of *Garns* v. *Rollins,* supra, and by subsequent cases has been limited strictly to its facts and the doctrine of the latter case. *Stookey* v. *Green,* 53 Utah 311, 178 P. 586.

In *Peterson* v. *Eureka Hill Min. Co.,* 53 Utah 70, 176 P. 729, it was held that,

"Where a mining company has appropriated the waters of a spring located on the public domain and has subsequently acquired title to the premises, another cannot over the owner's protest acquire any rights to such waters by making application to the state engineer's office."

In *Stookey* v. *Green,* 53 Utah 311, 178 P. 586, 587, the case was remanded for further evidence as to whether or not the land on which the spring arose was public domain at the time the waters were diverted and put to a beneficial use. The previous cases by the Utah court were reviewed and construed. The court said:

"Up to this time at least, it has *never been held by this court that water can be appropriated from private lands.* In fact the decisions

are all the other way wherever the question has been directly presented. * * *

"If it is private land and the water is percolating, as known and understood at the common law, then it is not the subject of appropriation as against the owner of the land." (Italics added.)

These statements may not be decisive as stare decisis, but they indicate that at no time had the Utah court held the doctrine of appropriation applicable to percolating waters in privately owned lands. If it be true that percolating waters may not be appropriated as against the owner of the land, how can it be said that one landowner may drive wells and drain the land of his neighbor and thereby acquire by appropriation a superior and exclusive right to the waters percolating in his neighbor's soil or under its surface merely because of priority of use or compliance with the statute as to appropriation? It would also follow, if these statements are true, that such waters are not public waters and are not subject to the statutory method of appropriation.

In *Rasmussen* v. *Moroni Irr. Co.*, 56 Utah 140, 189 P. 572, the court said that the case was the first and only case in this state involving the precise question there presented; that is, the right to the use of seepage or percolating waters coming from irrigation of upper lands and passing on their return into a stream, the waters of which had all been previously appropriated to a beneficial use. The case was denominated a river system case, and the decision was said not to involve or apply to artesian or subterranean waters.

*Peterson* v. *Lund*, 57 Utah 162, 193 P. 1087, is referred to and somewhat relied on by Justice MOFFAT in his opinion. The case was remanded for a new trial, similarly to the case of *Stookey* v. *Green*, supra, in order to obtain additional facts for the particular purpose of determining whether or not the lands on which the springs arose were public domain or private property at the time the waters thereof were put to a beneficial use. The court said the complaint alleged that plaintiff had used the water, but there was no allegation

of an appropriation of the water flowing from the springs and that the evidence was insufficient to justify a finding of appropriation. The case was remanded for further facts. The court also said that the waters from flowing springs were the subject of appropriation just as any other unappropriated waters, but still was unable to reach a decision because of no showing of an appropriation while the land on which the spring arose was part of the public domain. If this fact had not been of controlling importance, the case might well have been decided without additional facts, since priority of use was shown and that the waters had been put to a beneficial use; the flow having been interfered with by the driving of wells by the defendant. Plaintiff's springs and defendant's wells apparently drew water from the same artesian basin, and the driving of the wells lessened the pressure and diminished the flow of plaintiff's spring. The evidence was unsatisfactory as to measurements, and for this additional reason the case was remanded. The court refrained from expressing an opinion on the particular rules which should apply to the facts until further evidence was taken. The doctrine of correlative rights or reasonable use was referred to but neither adopted nor rejected.

In *Deseret Live Stock Co.* v. *Hooppiania,* 66 Utah 25, 239 P. 479, 484, the court made a statement which is an accurate restatement of the rule announced in the cases cited to support it:

"We do not find any conclusive evidence in the record as to whether or not the lands upon which these springs are located were part of the public domain at the time of the attempted appropriation. The waters from the springs in controversy were not sufficient in volume to run into or create a natural channel, and were not sufficient in volume to run to appellant's land, and would not reach appellant's land without being fed by water from other sources. The waters of the springs are therefore percolating waters, and if such springs are located upon private lands the waters arising therefrom are not subject to appropriation. *Stookey* v. *Green,* 53 Utah 311, 178 P. 586; *Peterson* v. *Eureka Hill M. Co.,* 53 Utah 70, 176 P. 729; *Willow Creek Irr. Co.* v. *Michaelson,* 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687. Such of the springs as are located upon the home-

stead of Hooppiania are not upon the public domain, and are therefore not subject to appropriation by appellant."

If this statement be true, then the waters of this spring were not public waters, but owned by the owner of the land as a part thereof. If such waters were subject to the law of appropriation, I see no reason why they could not be appropriated by any one who should comply with the statute and make a valid appropriation even though the waters arose on the lands of another.

*Holman* v. *Christensen*, 73 Utah 389, 274 P. 457, 459, while holding that spring water flowing in a natural channel is subject to appropriation by any person who could put it to a beneficial use whether the land on which it arose was public domain or privately owned, said:

"It should be observed that we do not here hold that water arising from springs on private land and flowing off such land in a manner other than through a natural channel is subject to appropriation."

*Petersen* v. *Cache County Drainage Dist. No. 5*, 77 Utah 256, 294 P. 289, while discussing the law of reasonable use and correlative rights, the court stated that such doctrine had no application because the waters involved were merely irrigation waters and that the rule of correlative rights applied only to water percolating through the soil from natural causes.

The cases thus far discussed establish, I think, the rule that the owner of the soil is the owner of waters percolating in or through his lands and that such waters are not subject to appropriation by any one except the owner, and do not disclose that such owner is obliged to comply with the law of the state with respect to making his appropriation in the manner by law required; that is, he may put his waters to a beneficial use on the lands where found, or elsewhere where other's rights are not impaired, not by reason of the law of prior appropriation, but because of his ownership of the freehold in which such waters are percolating. This

right of the owners of a freehold to the waters percolating in or through his lands is not an absolute or unconditional right, but is a modified or limited right. The first modification of the rule is found in the mining and tunnel cases and the river system case where, notwithstanding prior appropriation of the waters of the stream and the principle of law which gives the appropriator a vested interest in the water so appropriated back to the source of supply in the watershed lands (*Cole* v. *Richards Irr. Co.*, 27 Utah 205, 75 P. 376, 101 Am. St. Rep. 962), the owner of the soil may nevertheless operate and develope his lands by draining, driving tunnels, or other necessary and reasonable use thereof. In *Rasmussen* v. *Moroni Irr. Co.*, supra, plaintiff collected from seepage and percolations on his land waters which he diverted into the river and attempted to divert from the river at a lower point onto other lands owned by him. The court held that all such waters were tributary to the river and could not be diverted to other lands, but plaintiff might use them on the lands on which they were gathered.

The Circuit Court of Appeals in *Midway Irr. Co.* v. *Snake Creek Min. & Tunnel Co.*, 271 F. 157, affirmed by the Supreme Court of the United States in 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 423, held that the reasonable use or correlative right doctrine was the law of Utah, and applied such doctrine to the facts of that case, permitting the mining company to make a reasonable use, in connection with the operation of its mine, of the waters developed in its mining operations, but said that to sell such waters to irrigation companies was not a reasonable and beneficial use in connection with the business of the mining company and this would not be permitted when to do so would deprive prior appropriators of water which they had appropriated and put to a beneficial use.

The correlative right doctrine is recognized by textwriters, as well as the courts of many jurisdictions, as a just and equitable rule that is now fully established. Says Kinney

in his work on Irrigation and Water Rights, vol. 2 (2d Ed.) p. 2134:

"The cujus est solum, etc., doctrine as modified relative to these waters means in effect that, although you may be the owner of the soil and everything in it to the lowest depths, you must so use these subterranean waters found in your own land that the use will not injure the rights or property of another. And although this modified maxim or rule of law applies to other percolating waters than the ones now under discussion, it applies with special force to the waters of artesian basins for the reason that the porous strata wherein these waters are found usually underlie large areas of country, and the tapping of which by artesian wells will draw the waters from the lands of many owners. And, although even the modern authorities are by no means unanimous in the adoption of this modified rule, *we are of the opinion that it is the only just and equitable one.* And, therefore, the rule should be applied to all cases where it is known that by the flow of artesian wells naturally overflowing the surface, or the pumping of water in considerable quantities from wells on the lands of one person it draws from or prevent it from percolating to the lands of others, to their injury. And this rule of correlative rights has been adopted as the rule of law governing the waters of artesian basins in many States."

And Wiel in 2 Water Rights in the Western States (3d Ed.) pp. 1045 and 1047, says:

"As laid down in these cases, the rule now is that all persons having land over an underground supply of percolating water have by nature certain rights to the use of their lands by means of the water, whether they exercise them or not, and they may begin to exercise them whenever they will. Priority in time of use will give no better right, and nonuse will affect only the remedy (refusing a prohibitive injunction and granting instead a declaratory decree declaring the right to begin use on his land whenever he will). It is hence settled that no exclusive right under the law of appropriation will be permitted, because of priority of use, to defeat the use of one's own land at any time. * * *

"The sprit of the new law of percolating water, as well as the rulings under it, *make directly against the law of exclusive rights by priority of appropriation.*"

In a scholarly article entitled "Natural Communism, Air, Water, Oil, Sea and Seashore," 47 Harvard Law Review, p. 425, Mr. Samuel C. Wiel says:

"There are few states today that have not removed groundwater from this influence (English rule) and transferred it into the 'Negative Community,' with the appropriate consequences of common property, correlative rights and reasonable use."

See, also, the exhaustive brief on subterranean or percolating water in 55 A. L. R. 1385, and the recent case of *Maricopa County, etc.,* v. *Southwest Cotton Co.,* 39 Ariz. 65, 4 P. (2d) 369.

Because of the fugitive or migratory quality of water, in that it seeks its level, one landowner may drain his neighbor's land and deprive him of the water therein. This led the courts to adopt the more equitable and just rule of correlative rights, known also as the "American" doctrine, which has been followed in many jurisdictions including our own in *Horne* v. *Utah Oil Refining Company,* supra. The decisions of the courts in this and other jurisdictions were analyzed, considered, and discussed by Mr. Justice Thurman in that case in such thorough manner that it is needless to further refer to them here. The quotations above from Mr. Kinney and Mr. Wiel well state the conclusions reached in the cases prior to the decision by this court in the Horne Case.

While this court had previously indicated in no unmistakable language its leaning toward the American rule as applicable to percolating waters, the court in that case for the first time unequivocally committed itself to the American rule, and recognized the correlative rights of adjoining landowners to the underground waters percolating in and through their respective tracts of land. Mr. Justice Thurman, the writer of the decision, said:

"The doctrine of correlative rights or reasonable use is the nearest approach that can be made towards a literal application of the maxim, 'cujus est solum,' etc., as far as underground percolating water is concerned."

Indeed, two maxims of the common law are brought into use, one to modify the other; the maxim of *cujus est solum ejus est usque ad infernos,* being the one which fixes the

right of the owner of the freehold to the percolating waters in the soil, and the other, *Sic utere tuo ut alienum non laedas*, being a modification of the first requiring the owner to so use his own as not to injure the property of another. In other words, he may not so use his available opportunities in such a way as to take that which belongs to adjoining owners who are, in effect, tenants in common with him in the water percolating through their respective tracts of land.

The decision in the Horne Case was well considered and ably written. The doctrine of that case was affirmed in *Glover* v. *Utah Oil Refining Co.*, 62 Utah 174, 218 P. 955, 31 A. L. R. 900. These decisions are in harmony with and the culmination of a line of decisions which foreshadowed and logically led to the application of the law of correlative rights to underground percolating waters. This court in the Horne Case announced a rule applicable to the facts of that case which I am unwilling at this time to modify or overrule; that is, that each proprietor of land within an artesian district is entitled to water proportionate to his surface area, provided he makes a beneficial use of it. This rule may not be the most just and equitable as applied to the facts in all cases and may not necessarily be the only application of the doctrine of reasonable use to measure the rights of common owners, but I think it is a workable and sound rule and should be used where the facts permit of its application. In *Erickson* v. *Crookston Waterworks, Power & Light Co.*, 105 Minn. 182, 117 N. W. 435, 17 L. R. A. (N. S.) 650, the court said that what constitutes a reasonable use is a question of fact to be determined from the facts and circumstances of each particular case. There the defendant city drove wells into an artesian basin on property owned by it and pumped the water out for the use of the inhabitants of the city whose lands also lay over the artesian basin, thereby reducing the water level in the ground. The trial court limited the use by the city so that it could not reduce the water level to a point lower than 50 feet below the surface of the ground, but the Supreme Court reversed this decree as an unreasonable re-

quirement and permitted the city to take the water for the reasonable use of its inhabitants even though the water level was reduced below 50 feet from the surface. This left it so that the plaintiff was required to pump in order to secure his supply, but there was water in the ground available to him by means of pumping and the court held that this was a reasonable use by both parties. A salutary rule deduced from this decision is well stated by the brief of defendants:

"Neither one nor more than one can withdraw water in such quantities as will lower the general level to a point from which the general supply is not readily, easily and economically available."

I am also very much impressed with other statements of the law under the correlative rights doctrine made in the same brief:

"No man is entitled to waste water; he has a right only to what he uses beneficially.

"Every owner over an artesian basin is entitled to make a reasonable use of the common supply. There are no preferences and no priorities.

"If the common supply is sufficient, each has the right to use all he needs. That is a reasonable use under those circumstances.

"If one does not need water or wastes it, others may use that water, apportioning it according to their respective acreage and their needs.

"If the common supply is barely sufficient or less than sufficient, as in the Horne Case, each 'should be limited to his just proportion according to his surface area.' That is a reasonable use under those circumstances.

"No owner has a vested right in pressure. All rights are strictly correlative, each bearing his share of the burdens as well as enjoying his share of the blessings.

"If it is 'reasonably necessary for the beneficial purposes to which he devotes the water' an owner may withdraw his rightful portion 'to the injury' (not in the technical sense) 'of others similarly situated' (quotation from Horne Case). That is reasonable."

It should be noted that in the case before us both parties are owners of land overlying an artesian or percolating water area, and that no attempt is made by any landowner to take the water away from the basin for use elsewhere, but are

only attempting to use the water on their lands within the artesian district.

It is said to be illogical to distinguish between a spring or a well dug or a pipe driven into the ground to develop water; reference being made to *Sullivan* v. *Northern Spy Min. Company*, supra, which sustained the right of one to dig a well and obtain a right to the use of percolating waters thereby under the law of appropriation, and to *Peterson* v. *Lund*, supra, where the appropriation was from a natural spring. The distinction is not controlling by the method of taking but by the fact of ownership of the soil. If the land is public domain, the waters are public and may be appropriated even if percolating. If the land is privately owned, the percolating waters belong to the owner of the soil and may not be appropriated or taken by anyone else as against the right of the landowner.

Two states have decided that percolating waters are public waters subject to the law of appropriation applicable to waters in surface streams, lakes and ponds. They are Idaho and New Mexico. The Idaho case of *Hinton* v. *Little*, 50 Idaho 371, 296 P. 582, 584, decided February 21, 1931, held that subterranean waters permeating horizonally through a basin and reaching the surface through ordinary openings in impervious stratum were subject to appropriation, and the rule, "first in time, first in right," would be applied. The decision rests on an early Idaho statute and previous cases construing it. The statute (C. S. Idaho § 5558) reads,

"The right to the use of the waters of rivers, streams, lakes, springs, and of *subterranean waters*, may be acquired by appropriation."

There is a strong dissenting opinion by Mr. Justice Budge, who holds the laws of correlative rights applicable. The suit was between adjoining landowners. Plaintiff had first driven wells on his lands and put the water to a beneficial use. Later the defendant drove wells on his land which plaintiff claimed interfered with and lessened the flow of his wells.

The result of the decision was that the plaintiff had the exclusive use of all the waters because of prior appropriation.

In the New Mexico case of *Yeo* v. *Tweedy*, 34 N. M. 611, 286 P. 970, decided April 16, 1930, a statute passed by the Legislature in 1927 declaring the waters of underground streams, channels, artesian basins, reservoirs, and lakes, the boundaries of which may reasonably be ascertained by scientific investigation or surface indications, to belong to the public and subject to appropriation to be not subversive of vested rights of owners of overlying lands. Since the statute was held to be merely declaratory of existing law, a full review of the history of the state with reference to its law of underground waters was given in the opinion. There is a dissenting opinion by Mr. Justice Parker, who holds with the American doctrine of correlative rights and thinks the decision violative of the constitutional provision that private property may not be taken for public use without compensation.

I refrain from any discussion of the results which might flow from the application of the law of appropriation to percolating waters. Serious objections will occur to any one who studies the problem. It is not for us to decide matters of policy, nor, indeed, to weigh the beneficial results which may follow the adoption of any particular policy. It is sufficient for us to declare the law as it is. We are not responsible for consequences. As I read the cases, it has never been the law in this state that the rule, "first in time, first in right," is applicable to underground percolating waters and it is too late now for this court to change the law in that respect. It may be too late even for legislative action declaring percolating waters to be publicly owned. It would be a taking of private property without compensation and seriously unsettle rights which have become vested. An early Legislature might well have declared that all waters, whether flowing on the surface, flowing underground, or percolating in the soil, were public waters and subject to appropriation. No Legislature of this state has so declared,

as did the Legislature of Idaho. The difference between the Utah and Idaho statute is obvious. The Idaho statute plainly states:

"The right to the use of * * * subterranean waters, may be acquired by appropriation."

Our statute, R. S. Utah 1933, 100-1-1, is:

"The water of all streams and other sources in this state, whether flowing above or under the ground in known or defined natural channels, is hereby declared to be the property of the public, subject" etc.

It is, I think, a strained construction which makes that language mean the same as if the statute had read,

"all waters in this state, whether on the surface or flowing or percolating underground, are declared to be the property of the public."

While the statute is not entirely free from ambiguity, it would seem to exclude percolating waters from the waters declared to be the property of the public. Section 2780 of Comp. Laws Utah 1888, which recognizes the right to the use of water "whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake, or spring, or other natural source of supply," may give rise to the suggestion that the words "other natural source of supply" were intended to include percolating waters. These words have been construed and have been made applicable to percolating waters only when the appropriation was made while the lands on which or in which such waters were found were still part of the public domain, and by the cases heretofore referred to restricted to such meaning. This provision of the statute was thus construed in *Willow Creek Irr. Co.* v. *Michaelson,* supra, and *Crescent Min. Co.* v. *Silver King Min. Co.,* supra, already quoted.

In no legislative act, from the beginning down to the present, are subterranean waters expressly mentioned, except in the later enactments where water in underground streams

flowing in known or defined channels are declared to be the property of the public.

The constitutional provision, article 17, § 1, lends no support to the theory that the underground waters of the state are publicly owned, but rather the contrary. The Constitution makers carefully refrained from asserting public ownership to any of the waters in the state, whether on the surface or underground. The section reads:

"All existing rights to the use of any of the waters in this State for any useful or beneficial purpose, are hereby recognized and confirmed."

Rights vested by reason of ownership of land, including the water therein, are here "recognized and confirmed," if that was the law at that time, to the same extent as rights obtained by appropriation.

If it be held that percolating waters are public waters and subject to the law of appropriation, then I see no escape from the conclusion that all the formalities required by statute must be complied with to entitle an appropriator to perfect his right whether he be the landowner or not. I am not inclined to overrule the case of *Deseret Live Stock Co.* v. *Hooppiania*, supra, certainly not at this time. Whether underground percolating waters be regarded as public or not the one thing needed at this time to effect a conservation of this natural resource is legislation extending a more definite control by the state engineer or other public authority. Conservation of the underground supply may be enforced by legislative action under either theory of ownership or right, and such control should be asserted and enforced without further delay.